Argued and submitted January 8, reversed and remanded March 17, 2010

In the Matter of K. A. C.,
a Child.

STATE OF OREGON,
*Petitioner-Appellant,*

*v.*

L. C.
and T. C.,
*Respondents.*

Polk County Circuit Court 7256J;
Petition Numbers 7256J3, 7256J4;
A143200 (Control)

In the Matter of K. C.,
a Child.

STATE OF OREGON,
*Petitioner-Appellant,*

*v.*

L. C.
and T. C.,
*Respondents.*

Polk County Circuit Court 7257J;
Petition Numbers 7257J3, 7257J4;
A143201

228 P3d 594

Christina M. Hutchins, Senior Assistant Attorney General, argued the cause for appellant. With her on the brief were John R. Kroger, Attorney General, and Jerome Lidz, Solicitor General.

Holly Telerant, Deputy Public Defender, argued the cause for respondent L. C. With her on the brief was Peter Gartlan, Chief Defender, Legal Services Division.

Megan L. Jacquot argued the cause and filed the brief for respondent T. C.

Before Landau, Presiding Judge, and Schuman, Judge, and Ortega, Judge.

ORTEGA, J.

## ORTEGA, J.

The state appeals from permanency judgments concerning two children. In those judgments, the juvenile court changed the permanency plan for the children from "APPLA"—that is, "another planned permanent living arrangement"[1]—to adoption and ordered the Department of Human Services (DHS) to file petitions to terminate mother's and father's parental rights; the court declined to find that DHS had made reasonable efforts. In this unusual case, father and mother support, while DHS opposes, a permanency plan of adoption. We conclude that, because the record as of the permanency hearing shows that it is unlikely that an adoptive placement will be found for the children, the juvenile court erred by changing the permanency plan to adoption and, consequently, by ordering DHS to file a termination petition. We therefore reverse and remand.

■ We review to determine whether a preponderance of the evidence supports the juvenile court's determination that a change in the permanency plan is in the children's best interests. *State ex rel Dept. of Human Services v. S. L.*, 211 Or App 362, 371, 155 P3d 73 (2007). The state has not set forth reasons that we should exercise our discretion to review *de novo*, ORAP 5.40(8)(a), and we decline to do so. ORS 19.415(3)(b); *see also* Or Laws 2009, ch 231, §§ 2, 3 (establishing the effective date for the change in the standard of review). Although the parties vigorously dispute the legal implications of the pertinent facts, the facts themselves are not disputed.

---

[1] APPLA refers to "an out-of-home placement other than by adoption, placement with a relative or placement with a legal guardian that is consistent with the case plan and in the best interests of the ward." ORS 419A.004(18). The version of OAR 413-070-0532 in effect at the time of the July 2009 permanency hearing describes APPLA as

"a plan for a stable, secure living arrangement, developed for a child, that includes building relationships with significant people in the child's life that will continue beyond substitute care. 'Planned' means the arrangement is intended, designed, considered, premeditated or deliberate. 'Permanent' means enduring, lasting, or stable. An APPLA plan includes not only the physical placement of the child, but also the quality of care, supervision, and nurture the child will be provided by a specified adult or adults. APPLA is the least preferred permanency plan for a child."

DHS subsequently revised and renumbered its definition of APPLA, effective November 3, 2009. OAR 413-070-0523(1).

The children at issue are sisters who were, at the time of the permanency hearing, ages 14 and 10. Mother and father became the children's foster parents in October 2004 and adopted them after their biological parents' rights were terminated. The decree of adoption issued in October 2007.

A little less than a year later, in August 2008, the children reported that father had sexually abused them. DHS removed the children from the family home and placed them in foster care. Father denied the allegations, and mother, who did not believe the children, was unwilling to enter into a safety plan. The juvenile court took jurisdiction as to mother in September 2008 and as to father in January 2009. Both parents contended that the children had made the allegations in hopes of being reunited with their biological mother and, although it did not take testimony as to that contention, the juvenile court apparently agreed with parents' view.

No one contends that reunification of the family is possible in this case. The children do not want to return to father and mother. Parents likewise do not want the family to be reunited, nor would they provide the names of relatives with whom the children might be placed. In a January 2009 permanency judgment, the juvenile court approved a permanency plan of APPLA.

After removing the children, DHS attempted to recruit an adoptive family and detailed those recruitment efforts for the court, but it was not confident that it would find a suitable family. DHS took the position that "[t]he age of these children, combined with their history, high needs and the unsuccessful recruitment to date leaves DHS unable to conclude that it can successfully place and maintain the children in any adoptive placement." At a review hearing shortly before the permanency hearing, no one questioned DHS's representation that it was "using all the recruitment resources possible, including things we don't typically use this early in recruitment for kids." Father's attorney observed that "taking a look at the previous psychological [assessments] concerning the children, and taking a look at where the children have indicated that they want to be, back

with the [biological] mother, I don't see any placement being successful for them."

Although the juvenile court was critical during the permanency hearing of what it characterized as DHS's position that "we can't file a petition to terminat[e] parental rights at this time and get somebody else in the whole wide world to step up and be adoptive [resources]," we do not understand the court to have found that a suitable adoptive placement was likely to be located. Indeed, shortly before the permanency hearing, the juvenile court itself expressed skepticism regarding the likelihood of an adoptive placement. The court's primary concern was its sense that "the parents cannot be expected * * * to be able to perform as parents for these children. That is a basis for termination of parental rights." After the permanency hearing, the court changed the permanency plan from APPLA to adoption and ordered DHS to file a petition to terminate parental rights.

The state appeals and argues that, under the applicable statutes and administrative rules, DHS cannot petition for termination "unless it is reasonably certain that an adoptive placement for the children will be available."[2] In the state's view, when severing the legal parent-child relationship would cause the children to become legal orphans rather than to be adopted, termination of parental rights is not in the children's best interests.

Mother and father disagree. Mother argues that the juvenile code does not require that the filing of a termination petition wait until an adoptive placement is identified or approved or until DHS has determined that adoption is probable. Father also contends that permanency hearings require a focus on the children's health and safety and that, given the breakdown of the family, it was in the children's best interest to terminate parental rights.

■        The issue on appeal is whether the juvenile court erred by changing the permanency plan to adoption. Because

[2] DHS rules limit the circumstances in which DHS can seek termination of parental rights. For example, OAR 413-110-0220 provides, "DHS shall only initiate a termination of parental rights action to free a child for adoption and where DHS has determined that adoption is in the child's best interest, and that other possible permanent plans such as guardianship would not be a more appropriate plan."

the record demonstrates that an adoptive placement for the children is unlikely to be found, we conclude that the court erred.

Although the statutes concerning termination of parental rights do not directly address the relationship between the filing of a termination petition and a future adoption, the statutory scheme suggests that the legislature intended the termination of parental rights to result in the creation of a new parent-child relationship through adoption. ORS 419B.498(3) provides, in part, that a petition for termination of parental rights may not be filed "until the court has determined that the permanency plan for the child or ward should be adoption after a permanency hearing." In the order entered after the permanency hearing, the court must determine, as part of the permanency plan, whether and when the ward will be placed for adoption and a petition for termination of parental rights will be filed; no such determination is required if the plan is a legal guardianship or APPLA. ORS 419B.476(5)(b).

Furthermore, under ORS 419B.476(5)(d), if the court determines that the permanency plan should be adoption, the court must determine whether one of the circumstances described in ORS 419B.498(2) is applicable. ORS 419B.498(2) creates exceptions to circumstances in which DHS ordinarily would be required to file a termination petition. One such exception is this:

> "There is a compelling reason, which is documented in the case plan, for determining that filing such a petition would not be in the best interests of the child or ward. Such compelling reasons include, but are not limited to:
>
> "* * * * *
>
> "(B) Another permanent plan is better suited to meet the health and safety needs of the child or ward, including the need to preserve the child's or ward's sibling attachments and relationships[.]"

ORS 419B.498(2)(b). It is difficult to see how a permanency plan of adoption would be better suited than other permanency plans, such as APPLA, to meet the ward's needs if an actual adoption is unlikely.

■       A permanency plan of adoption implicitly requires some likelihood that adoption will be achieved. We cannot conceive of a reason that the legislature would require, as a precondition to the filing of a termination petition, the approval of a plan that was unlikely to be achieved. Consistently with our understanding, Senator Brown, a sponsor of the bill creating that requirement in ORS 419B.498(3), told the Senate Committee on Judiciary that,

> "in order to provide permanency for these children, the department has moved forward on these termination cases, and what has resulted in some cases is that there has not been an adoptive resource for the child, and we're hoping that this will make sure that there is an adoptive resource in place."

Audio Recording, Senate Committee on Judiciary, SB 408, Mar 15, 2007, at 28:40 (statement of Sen Kate Brown), http://www.leg.state.or.us/listn/ (accessed Mar 10, 2010). That understanding—that termination of parental rights is expected to be followed by adoption—also is consistent with ORS 419B.500, which provides, in part, that parental rights may be terminated "only upon a petition filed by the state or the ward *for the purpose of freeing the ward for adoption* if the court finds it is in the best interest of the ward."[3] (Emphasis added.)

        Father and mother point to other juvenile code provisions that, in their view, demonstrate that a likelihood of adoption is not a prerequisite to termination of parental rights. Father relies on the final sentence of ORS 419B.500: "The rights of one parent may be terminated without affecting the rights of the other parent." In his view, that provision demonstrates that termination is not necessarily conditioned on adoptability.

---

[3] ORS 419B.500 provides:

"The parental rights of the parents of a ward may be terminated as provided in this section and ORS 419B.502 to 419B.524, only upon a petition filed by the state or the ward for the purpose of freeing the ward for adoption if the court finds it is in the best interest of the ward. If an Indian child is involved, the termination of parental rights must be in compliance with the Indian Child Welfare Act. The rights of one parent may be terminated without affecting the rights of the other parent."

To allow the possibility that only one parent's rights will be terminated after a termination hearing, however, is not inconsistent with a requirement that, before any termination petition is filed, the permanency plan must be adoption and, implicitly, that adoption cannot appear to be an unlikely outcome. There is a logical distinction between (1) requiring approval of a permanency plan of adoption and (2) predicting what the evidence will show about parental fitness at a termination hearing. At a permanency hearing, adoption may appear to be the most appropriate plan for a child; at a subsequent termination hearing, the evidence may show that one parent has made significant progress and that the other parent is unfit and presents a risk of harm to the child, thus justifying termination of only one parent's rights. *See State ex rel Juv. Dept. v. Proctor*, 167 Or App 18, 2 P3d 405, *adh'd to on recons*, 169 Or App 606, 10 P3d 332 (2000) (terminating only one parent's rights).[4] Recognizing that the record may be different at the termination hearing, however, does not eliminate the requirement that a permanency plan of adoption must precede the filing of any petition to terminate parental rights. And, as explained above, that permanency plan implicitly requires that adoption appear to be a likely outcome.

■    We acknowledge that our reading of ORS 419B.498(3) means that the termination of one parent's rights under ORS 419B.500 can occur only in limited circumstances. Nevertheless, our construction gives effect to both statutes. *See* ORS 174.010 ("[W]here there are several provisions or particulars such construction is, if possible, to be adopted as will give effect to all."). Father's construction of ORS 419B.500, on the other hand, would make the change in permanency plan under ORS 419B.498(3) a meaningless act.

---

[4] On reconsideration in *Proctor*, we rejected the state's argument that terminating the father's parental rights was not in the child's best interests because the mother's rights had not been terminated. 169 Or App at 608-09. We observed that "nothing in the language of the statutes on which the state relies or in the statutes that establish the criteria for termination of parental rights * * * limits the court's authority to terminate a parent's rights *only to* circumstances where an adoption is planned." *Id.* at 610 (emphasis in original). As explained above, the authority to terminate is a different issue from compliance with ORS 419B.498(3). We also note that ORS 419B.498(3) was enacted in 2007, long after our decision in *Proctor*. Or Laws 2007, ch 234, § 1.

Furthermore, to the extent that ORS 419B.498(3) and the ORS 419B.500 "rights of one parent" provision are inconsistent, ORS 419B.498(3) is the later-enacted statute. Generally, when two statutes are inconsistent, the later-enacted statute prevails. *Koennecke v. Lampert*, 198 Or App 444, 453 n 6, 108 P3d 653, *rev den*, 339 Or 66 (2005).

We also reject mother's argument relying on ORS 419B.498(1), which provides that, under specified conditions, "the Department of Human Services shall simultaneously file a petition to terminate the parental rights of a child or ward's parents and identify, recruit, process and approve a qualified family for adoption." Mother contends that, because DHS may be required to undertake those actions simultaneously, the possibility of adoption cannot be a prerequisite to the filing of a termination petition. Again, however, we do not understand the legislature to have required DHS to undertake actions that it has reasons to expect will be fruitless—and indeed, here the record reflects that DHS had begun the process of identifying and recruiting an adoptive family without success. Rather, the legislature anticipated that DHS would ultimately "approve a qualified family for adoption"—that is, that adoption likely will follow the termination of parental rights.

DHS rules, consistently with that legislative intent, require the development of a permanency plan of adoption only where there is a probability that the child will be adopted. OAR 413-110-0320 provides, in part:

"(3) If safe placement with a parent is not possible for a child, and the child can be legally freed for adoption and has an appropriate and available adoptive resource who wishes to adopt the child, it is concluded that adoption is an appropriate permanency plan for the child.

"(4) Adoption is not the most appropriate plan for every child.

"(5) The Department will not initiate proceedings to free a child for adoption *unless there is a probability of being placed with an approved family.*"

(Emphasis added.) *See also* OAR 413-110-0210(2) ("No child shall be freed for adoption without the probability of being

placed in a permanent home."); OAR 413-110-0330(3)(d) ("Before the Department initiates the permanency plan for adoption, the legal assistance specialist and the local office must agree that the plan is in the child's best interests and is achievable."). Because there is no evidence in the record that an adoptive placement is likely and there is persuasive evidence to the contrary, the court erred in changing the permanency plan to adoption.

■      We appreciate the juvenile court's sympathy for father and mother, given the court's apparent view that the family broke down because of trauma suffered by the children before being adopted. The juvenile code, however, does not provide for a permanency plan of adoption—or, accordingly, for the filing of a termination petition—under those circumstances. On this record, it appears that a suitable adoptive placement for the children is unlikely to be found. Accordingly, the juvenile court erred by changing the permanency plan to adoption. Because approval of a permanency plan of adoption is a precondition to the filing of a termination petition, ORS 419B.498(3), the court also erred by ordering DHS to file a petition to terminate father's and mother's parental rights.

We reject without discussion DHS's argument that the juvenile court erred by finding that DHS had not made reasonable efforts to place the children in accordance with the plan of APPLA. *See* ORS 419B.476(2)(b) (requiring, at a permanency hearing where the case plan is something other than reunification, a determination whether DHS "has made reasonable efforts to place the ward in a timely manner in accordance with the plan, including, if appropriate, reasonable efforts to place the ward through an interstate placement, and to complete the steps necessary to finalize the permanent placement").

Reversed and remanded.