Argued and submitted May 20, affirmed August 26, 2015

In the Matter of T. M. S.,
a Child.
DEPARTMENT OF HUMAN SERVICES,
*Petitioner-Respondent,*

*v.*

T. M. S.
and A. M. S.
*Appellants.*

Lane County Circuit Court
13099J;
Petition Numbers 13099J01, 13009J02;
A158383

359 P3d 425

Valerie Colas, Deputy Public Defender, argued the cause for appellant A. M. S. With her on the brief was Peter Gartlan, Chief Defender, Office of Public Defense Services.

Ginger Fitch argued the cause and filed the brief for appellant T. M. S.

Robert M. Wilsey, Assistant Attorney General, argued the cause for respondent. With him on the brief were Ellen F. Rosenblum, Attorney General, and Anna M. Joyce, Solicitor General.

Before Ortega, Presiding Judge, and DeVore, Judge, and Garrett, Judge.

ORTEGA, P. J.

**ORTEGA, P. J.**

In this juvenile dependency case, mother and her child appeal the juvenile court's judgment changing the permanency plan from reunification to adoption.[1] The court took jurisdiction over T because mother's substance abuse interfered with her ability to safely parent T. Mother and T, together, make three arguments that contest the juvenile court's change of the permanency plan to adoption: (1) mother had made sufficient progress in the services provided to her to allow T to safely return home, and, as a consequence, a compelling reason existed to determine that filing a termination petition would not be in T's best interests, ORS 419B.498(2)(b)(A); (2) the bond between mother and T is a compelling reason to determine that filing a termination petition would not be in T's best interests under ORS 419B.498(2)(b)(B); and (3) the failure to complete an updated psychological evaluation before the permanency hearing constituted a failure to provide sufficient services under ORS 419B.498(2)(c). We reject each of those arguments and conclude that the juvenile court did not err in changing the permanency plan to adoption. Accordingly, we affirm.

Neither party asks us to review *de novo* the juvenile court's change of the permanency plan, and we decline to do so. ORS 19.415(3)(b); ORAP 5.40(8)(c) (*de novo* review is appropriate in "exceptional cases"). Rather, we "view the evidence, as supplemented and buttressed by permissible derivative inferences, in the light most favorable to the [juvenile] court's disposition and assess whether, when so viewed, the record was legally sufficient to permit that outcome." *Dept. of Human Services v. D. A. N.*, 258 Or App 64, 65, 308 P3d 303, *rev den*, 354 Or 490 (2013) (citing *Dept. of Human Services v. N. P.*, 257 Or App 633, 307 P3d 444 (2013)).

The Department of Human Services' (DHS) involvement with mother and T began in January 2013, when T

---

[1] Father was not involved in the proceeding and, at the time of the permanency hearing, his whereabouts were unknown; he does not appeal the permanency judgment.

was five years old. Mother was then using methamphetamine and experienced domestic violence at the hands of her long-term boyfriend, who attacked her with a weapon in front of T, and her home was below community standards. T was placed with her grandmother. On March 4, 2013, DHS filed a dependency petition on the ground that mother's substance abuse interfered with her ability safely parent T. DHS removed T to foster care. T's issues were significant: speech delays, inability to follow directions, short attention span, unwillingness to eat anything but junk food, and severe dental concerns.

In accordance with DHS's case plan, mother received counseling and medication management. She underwent a psychological evaluation with Dr. Truhn, who diagnosed her with major depressive disorder, post-traumatic stress disorder, generalized anxiety disorder, panic disorder, and methamphetamine and cannabis dependence. Truhn recommended intensive mental health treatment, medication management, and drug intervention, and a monitored living arrangement. Mother followed through on that recommendation by securing housing in an intensive case management program. The program and DHS worked closely with her, providing support and additional services for her substance abuse recovery and parenting skills.

In February 2014, T was returned to her mother's care. A number of service providers, including a DHS caseworker and T's counselor, regularly visited the home after T's return. Although mother was doing better, T struggled. T tested mother when she tried to set limits; for example, T only wanted to eat junk food and threw tantrums when it was denied to her. Eventually, working with a therapist, T did better. While T was in mother's care, it took vigorous prompting by service providers for mother to follow through with dental and medical care required for T. Mother also required pressure from service providers to follow through on her own services. In April 2014, a hearing was held to review mother's progress and the juvenile court expressed concern that mother was unable to engage with services on her own without prompting.

The following month, mother relapsed on methamphetamine. DHS allowed T to remain in the home but put in place a number of conditions, including requiring mother to attend 12-step meetings and find another sponsor, keep all of her home visits and doctors appointments, and return service providers' phone calls within a couple of hours. DHS made it clear that mother could not have overnight guests or associate with unsafe persons or substance abusers. Mother failed to meet those conditions. DHS removed T from mother's care on July 22, 2014, and, in the week before the removal, police were called to the home to respond to late-night partying and domestic violence, and unknown men came and went from the home, along with T's father, a registered sex offender, and mother's boyfriend, who had attacked mother with a weapon. The caseworker suspected that mother was using methamphetamine.

Mother failed to successfully engage in services during the months preceding the permanency hearing. She received an assessment from Willamette Family Treatment Services (WFT), and DHS referred her back to mental health and intensive outpatient treatment. Mother admitted to struggling with drug use and, in September 2014, again tested positive for methamphetamine. She did not follow through with the outpatient treatment, and, the day before the permanency hearing on November 12, WFT discharged mother for noncompliance. T was in her fourth foster home and, according to her court-appointed special advocate (CASA), had made progress in socialization and exhibiting appropriate behaviors while in foster care.

At the permanency hearing, the parties raised the issue that the juvenile court, three months earlier and by a different judge, had ordered an updated psychological evaluation, which DHS had scheduled to occur one week after the hearing. Mother argued to the court that the change in permanency plan should be delayed because, without the updated evaluation, the court would be without a "significant tool in determining whether a move to the alternate plan would be appropriate." According to mother, the purpose of the psychological evaluation was to assess mother's progress. DHS stated that the evaluation had been ordered because mother was not cooperating.

The court changed the plan to adoption, finding:

"I think that the evidence shows that [mother] made progress, but she made progress with significant help and with people essentially holding her up and walking her through the process. When that help was reduced to see if she could do it on her own it didn't occur.

"[Mother's attorney] is correct that relapses occur when someone is going through treatment, but relapses also can reoccur and reoccur and reoccur and just keep on being a problem.

"Subsequent to that relapse, there had been a pattern of choices as far as not being reengaged in re-referred services, remaining in contact—significant contact with people who had—are a danger to the child, specifically the person who had been the offender in the domestic violence case that was both reported by the child and reported by—or confirmed by [mother], and with the father who is a sex offender who was staying overnight. Both people were reported as staying overnight, admitted to the staying overnight."

Mother and child in this appeal challenge the following determinations by the juvenile court as set out in a "check-the-box" permanency judgment:

"Mother is involved in the case and **has not** made sufficient progress toward meeting the expectations set forth in the service agreement, letter of expectation and/or case plan, and the child **cannot be** safely returned to mother's care."

(Boldface in original.) And:

"<u>None of the circumstances described in ORS 419B.498(2) applies because</u>: *** there is **not** a "compelling reason" within the meaning of that term in ORS 419B.498(2)(b) for determining that filing a petition to terminate the parent's *** parental rights would not be in the child's best interest **and** the circumstances described in ORS 419B.498(2)(c) are **not** present."

(Boldface and underline in original.)

We begin by providing an overview of the relevant statutory provisions governing permanency hearings and the termination of parental rights. If, at the time of the

permanency hearing, the plan is reunification of the family, ORS 419B.476(2)(a) requires the juvenile court to "determine whether [DHS] has made reasonable efforts * * * to make it possible for the ward to safely return home and *whether the parent has made sufficient progress to make it possible for the ward to safely return home.*" (Emphasis added.) If the juvenile court determines that reasonable efforts have been made and the parent has not made sufficient progress, and consequently changes the permanency plan to adoption, it must also determine, under ORS 419B.476(5)(d), "whether one of the circumstances in ORS 419B.498(2) is applicable[.]" ORS 419B.498(2), in relevant part, provides:

"The department shall file a petition to terminate the parental rights of a parent in the circumstances described in subsection (1) of this section unless:

"* * * * *

"(b)   There is a compelling reason, which is documented in the case plan, for determining that filing such a petition would not be in the best interests of the child or ward. Such compelling reasons include, but are not limited to:

"(A)   The parent is successfully participating in services that will make it possible for the child or ward to safely return home within a reasonable time as provided in ORS 419B.476(5)(c);

"(B)   Another permanent plan is better suited to meet the health and safety needs of the child or ward, including the need to preserve the child's or ward's sibling attachments and relationships; or

"* * * * *

"(c)   The department has not provided to the family of the child or ward, consistent with the time period in the case plan, such services as the department deems necessary for the child or ward to safely return home, if reasonable efforts to make it possible for the child or ward to safely return home are required to be made with respect to the child or ward."

We have described the determinations a juvenile court must make under ORS 419B.498(2) after a permanency hearing as

"reflect[ing] that 'the legislature has expressed its intent that the trial court carefully evaluate DHS's decision to change a permanency plan for a child in order to ensure that the decision is one that is most likely to lead to a positive outcome for the child.' *State ex rel DHS v. M. A. (A139693)*, 227 Or App 172, 183, 205 P3d 36 (2009). That 'child-centered * * * determination' under ORS 419B.498(2) requires the court to determine 'whether it is in the child's best interests *not* to file a petition for termination because the child can be returned home within a reasonable time.' *[Dept. of Human Services v.] C. L.*, 254 Or App [203,] 214[, 295 P3d 72 (2012), *rev den*, 353 Or 445 (2013)] (emphasis added)."[2]

*Dept. of Human Services v. M. H.*, 266 Or App 361, 367, 337 P3d 976 (2014).

With those provisions in mind, we first address mother's contention that DHS failed to prove that she had not made sufficient progress to make it possible for T to safely return home. ORS 419B.476(2)(a). The juvenile court found that any progress made was due to the considerable efforts of service providers and that mother was unable to progress on her own. Further, the court noted mother's repeated relapses into substance abuse, which included, most recently, drug use less than two months before the permanency hearing. Finally, mother had failed to engage with the services provided by WFT in the months preceding the permanency hearing, as evidenced by her discharge for non-compliance from the program the day before the hearing. Accordingly, the evidence was legally sufficient to support the court's determination that mother had not made sufficient progress under ORS 419B.476(2)(a).

We likewise reject mother's and T's contention that mother's engagement in services constitutes a compelling reason under ORS 419B.498(2)(b)(A) for the juvenile court to decline to change the permanency plan. As noted, subparagraph (A) provides that, if "[t]he parent is successfully participating in services that will make it possible for the

---

[2] We were referring to ORS 419B.498(2)(b)(A), the only subparagraph in ORS 419B.498(2) that refers to "reasonable time."

child * * * to safely return home within a reasonable time as provided in ORS 419B.476(5)(c)," DHS may not file a petition to terminate parental rights. Mother and T posit that mother's relapse in May 2014 was too distant in time from the permanency hearing for the juvenile court to conclude that mother's substance abuse endangered T and that mother had accomplished many of the other objectives set out in the case plan. However, there is evidence that mother was using methamphetamine again as late as September 2014, and mother was not consistently participating with services in the months before the hearing. The record does not compel a ruling that mother's participation in services indicated that T would be able to return home within a reasonable time, but rather is legally sufficient to support the juvenile court's view that mother's limited progress did not rise to the level of a compelling reason to forego a change in plan to adoption.

We next address the argument from mother and T that the bond between them is a compelling reason to decline to change to a plan of adoption. Mother argues that it is "undisputed that T was attached to mother, wanted to maintain her relationship with mother, and opposed being adopted," and that T's "desire to preserve her relationship with mother constituted a compelling reason under ORS 419B.498(2)(b)(B) to forego implementing a permanency plan of adoption because [T's] unequivocal opposition to adoption and adamant desire to continue the parent-child relationship with mother likely rendered [T] unadoptable," and, consequently, "[a]nother permanent plan is better suited to meet the health and safety needs" of T, as contemplated by ORS 419B.498(2)(b)(B). T contends that the caseworker's statement that T "loves her mother very, very much" is the kind of evidence that the court must consider for its "child-centered * * * determination," *C. L.*, 254 Or App at 214, under ORS 419B.498(2)(b). T also posits that DHS's lack of a plan for adoption by a current caretaker with whom T has an attachment and the lack of evidence by a counselor or psychologist that T needs permanency also support her position that the bond between her and mother is a compelling reason to decline to proceed to adoption.

Assuming, without deciding, that the bond between a parent and a child can be a compelling reason to decline to pursue termination,[3] we conclude that the evidence here is legally sufficient to support a determination that the bond between mother and T does not constitute a compelling reason to avoid such a change in plan under ORS 419B.498(2)(b). The evidence they rely on—that is, the caseworker's testimony that T "loves her mother very, very much," T's decision to appeal the change of the permanency plan, and mother's counsel's statement that mother desired to parent T and be a good parent to her—is inadequate to establish, as the statute requires, a "compelling reason * * * for determining that filing such a petition would not be in the best interests of the child * * *." To be sure, ORS 419B.498(2)(b) calls for a "child-centered" determination, but T's opposition to adoption at age six does not establish what is in her best interests in light of mother's persistent problems with substance abuse and her inability to address those problems.

Moreover, we conclude that T's argument that DHS's lack of a proposed adoption placement and mother's argument

---

[3] As noted, mother relies in part on ORS 419B.498(2)(b)(B), which provides that a compelling reason exists to avoid pursuing termination where "[a]nother permanent plan is better suited to meet the health and safety needs of the child or ward, including the need to preserve the child's or ward's sibling attachments and relationships." The state emphasizes that that section refers only to a relationship with a child's siblings—but the statute provides that compelling reasons "include, but are not limited to" the listed reasons identified in subparagraphs (A) and (B). The importance of preserving child-parent relationships is emphasized in the juvenile law, including in the policy underlying it:

"It is the policy of the State of Oregon, in those cases not described as extreme conduct under ORS 419B.502, to offer appropriate reunification services to parents and guardians to allow them the opportunity to adjust their circumstances, conduct or conditions to make it possible for the child to safely return home within a reasonable time. Although there is a strong preference that children live in their own homes with their own families, the state recognizes that it is not always possible or in the best interests of the child or the public for children who have been abused or neglected to be reunited with their parents or guardians. In those cases, the State of Oregon has the obligation to create or provide an alternative, safe and permanent home for the child."

ORS 419B.090(5). That is, the dependency law accommodates a "strong preference" that a child remains with her parents, and when the juvenile court makes a determination that severing that relationship is in the child's best interests, that preference has been overcome with a determination that, for example, the parent's unfitness is seriously detrimental to the child. See ORS 419B.504 (termination because of unfitness).

that T's "unequivocal opposition to adoption" precludes a change of plan to adoption plan under ORS 419B.498(2)(b)(B) are unavailing. Both arguments rely on *State v. L. C.*, 234 Or App 347, 352-53, 228 P3d 594 (2010), *rev dismissed*, 349 Or 603 (2011), in which we held that, because the record demonstrated that an adoptive placement for the children was unlikely to be found, the juvenile court erred by changing the plan to adoption. The record here is dissimilar. Mother's contention regarding the likely effect of T's opposition to adoption is speculative and not supported by evidence in the record. To the contrary, relatives in Texas have expressed an interest in adopting T. Moreover, *L. C.* does not stand for the proposition that DHS must have a plan of adoption by a current caretaker to whom T has an attachment, but rather holds that that plan should not be changed where there is persuasive evidence that adoption is unlikely to be achieved. *Id.* at 352-53.

We turn, finally, to whether DHS's failure to provide an updated psychological evaluation before the permanency hearing constituted a failure to provide to the family, "consistent with the time period in the case plan, such services as the department deems necessary for [T] to safely return home" and, therefore, was a reason not to change the plan to adoption. *See* ORS 419B.498(2)(c); *Dept. of Human Services v. L. B.*, 246 Or App 169, 174 n 2, 265 P3d 42 (2011) ("Whether the agency has or has not provided services is a relevant 'circumstance' under ORS 419B.498(2)(c), but it is not, technically speaking, one of the 'compelling reasons' for not moving toward termination listed in paragraph (2)(b) of the statute."). T argues that, because there was no evidence that waiting a week or a month while mother received her updated psychological evaluation would be detrimental to T, the juvenile court erred in concluding that the circumstances described in ORS 419B.498(2)(c) are not present. Mother reprises her argument made below that an updated psychological evaluation was needed in order for the court to assess mother's progress, and also argues that the evaluation would have allowed a determination of what further services mother needed so that T could be returned within a reasonable time.

Where, as here, reasonable efforts must be made by DHS to allow the child to return home safely, ORS 419B.498(2)(c) forbids DHS from filing a termination petition if it "has not provided to the family * * *, consistent with the time period in the case plan, such services as the department deems necessary for the child * * * to safely return home." Accordingly, we must consider whether there was legally sufficient evidence to support the juvenile court to conclude otherwise. Mother argued that the psychological evaluation had been ordered so that the court could assess her progress, and not because of concern that DHS was not providing the necessary services so that T could be safely returned home. Additionally, the record does not indicate that the department failed to provide services consistent with the case plan. Mother received a psychological evaluation from Truhn, as well as extensive additional services all the way up to the permanency hearing. Mother had not followed through with those services and was discharged from WFT for noncompliance.

In light of the basis for the juvenile court's jurisdiction—mother's substance abuse, which interfered with her ability to safely parent T—the record does not establish that the juvenile court needed an updated psychological evaluation in order to assess mother's progress in addressing substance abuse. Mother had recently tested positive for methamphetamine and had been discharged from a substance abuse program for noncompliance. Nor has mother or T identified the services that an updated psychological evaluation could have suggested were needed beyond what mother was already receiving. Accordingly, we conclude that the juvenile court did not err in its determination that DHS had not failed to provide necessary services in a time period consistent with its case plan.

For the preceding reasons, we conclude that the juvenile court did not err in the determinations it made when it changed the permanency plan from reunification to adoption.

Affirmed.