Submitted August 2, affirmed October 16, 2019

In the Matter of R. K.-A. D.,
aka R. K.-A. D., a Child.
DEPARTMENT OF HUMAN SERVICES,
*Petitioner-Respondent,*

*v.*

C. M. D.,
*Appellant.*

Clatsop County Circuit Court
15JU02174, 18JU09417;
A170313 (Control), A170314

451 P3d 641

In this juvenile dependency case, mother appeals a permanency judgment continuing her son's permanency plan of adoption. In continuing the plan of adoption, the juvenile court rejected an argument by the Department of Human Services (DHS) and mother that the plan should be changed back to reunification due to there being a compelling reason to forgo termination of parental rights. On appeal, both mother and DHS argue that the juvenile court erred in continuing the plan of adoption. Mother's assignments of error focus on child's desire to live with her and on progress she has made in her parenting skills, while DHS's arguments focus on the unlikelihood of child being adopted given his high needs. *Held*: The record is sufficient to support the juvenile court's findings in support of its conclusions. With respect to child's adoptability, that is a significant issue in this case, but the existing record is insufficient to compel a finding that child was unlikely to achieve adoption.

Affirmed.

Paula Brownhill, Judge.

Shannon Storey, Chief Defender, Juvenile Appellate Section, and Sarah Peterson, Deputy Public Defender, Office of Public Defense Services, filed the brief for appellant.

Ellen F. Rosenblum, Attorney General, Benjamin Gutman, Solicitor General, and Inge D. Wells, Assistant Attorney General, filed the brief for respondent.

Before Armstrong, Presiding Judge, and Egan, Chief Judge, and Aoyagi, Judge.

AOYAGI, J.

Affirmed.

**AOYAGI, J.**

In this juvenile dependency case, the juvenile court took jurisdiction over R in June 2015 when he was five years old. In December 2018, the court changed R's permanency plan to adoption. In February 2019, the court continued the plan of adoption, rejecting an argument by the Department of Human Services (DHS) and mother that the plan should be changed back to reunification. Mother appeals the February 2019 judgment. We affirm.[1]

A detailed rendition of the history of this case would not benefit the parties, the bench, or the bar. For present purposes, the following facts are sufficient to frame our discussion. At the time of the relevant hearing, R was eight years old and had been in the state's care for almost four years. He had lived with the same foster family, with two very experienced foster parents, for the past three years. R experienced severe trauma prior to being taken into care, and, since being taken into care, had engaged in extreme behaviors, including killing small animals, breaking his teacher's jaw, and breaking his foster father's toe. Foster parents report that managing R's behaviors to keep R and others safe requires "continuous" efforts. After several years caring for R, foster mother believes that, in addition to suffering the effects of trauma, R may have "natural deficits or disabilities" and has been advocating for a higher-level mental health evaluation.

In March 2018, when R had been in care for nearly three years, the juvenile court changed R's permanency plan from reunification to placement with a fit and willing relative, with the understanding that DHS would try to qualify R's foster parents as "relatives." The court found that reunification was no longer in R's best interests, because mother did not have the skills necessary to safely parent him and, despite DHS's efforts, had been unable to learn those skills. At the same time, the court eliminated a concurrent plan of adoption as being "no longer in the child's best interest." The

---

[1] The state recently filed a notice of probable mootness, which mother opposed. We agree with mother that the appeal is not moot.

court determined that a compelling reason existed to forego the termination of parental rights: "Mother and child have a bond that should not be severed by termination of parental rights at this time. Mother will not be able to implement the skills necessary to parent this child, but she and the child should continue to have contact as long as it is safe and appropriate."

In October 2018, the juvenile court began another permanency hearing, which had to be continued to the next month for completion. Until the hearing could be completed, the court made interim findings and continued the existing plan, *i.e.*, placement with a fit and willing relative. The court found that reunification was not appropriate due to mother's inability to safely parent R; that guardianship was not appropriate because there was no guardianship resource; and that adoption was not appropriate because there was no adoptive resource, R "would not do well in a general recruitment because of his special needs," and R "is bonded with mother." The court noted that it "could be detrimental" to R to sever his bond with mother.

The hearing that had begun in October was completed in November, and, on December 3, 2018, the juvenile court entered a permanency judgment changing R's plan to adoption. By that time, R's foster parents were no longer considered a viable permanent placement resource.[2] The court determined that mother was not participating in services that would make it possible for R—a child who is "exceptionally difficult to parent"—to return home within a reasonable time. It also noted that "[a] failed reunification would have a significant negative effect on the child's well-being and future success." The court concluded that DHS had "failed to demonstrate a compelling reason why filing a Petition for Termination of Parental Rights would not be in the best interests of the child." Ultimately, the court concluded, "Of

---

[2] R's foster parents are not an adoptive resource. They were willing to be a guardianship resource but, as explained in the December 3 judgment, wanted an agreement with DHS that DHS would not enter, making guardianship "not appropriate." Placing R with his foster parents as "fit and willing relatives" also was off the table by December 2018, because, as explained in the December 3 judgment, they "do not qualify as relatives under DHS rules," and "DHS will not or cannot make an exception."

the available plans, adoption is the best one, although an open recruitment is not in the child's best interests."[3]

R's next permanency hearing occurred in early 2019 and resulted in a permanency judgment entered February 22, 2019. Numerous witnesses testified at the hearing. During the hearing, DHS and mother argued that R's plan should be changed back to reunification; R's attorney opposed that request. The juvenile court made credibility findings about the hearing witnesses, including treatment providers who disagreed about the best course of treatment for R, and ultimately continued the plan of adoption. The court explained that guardianship with R's foster parents would be in R's best interests, "but, because that is not achievable, adoption is the best plan." On the "compelling reason" issue, the court concluded that DHS had failed to demonstrate a compelling reason why filing a petition to terminate parental rights was not in R's best interests.

On appeal of the February 2019 judgment, mother raises seven assignments of error—which she argues together in a combined argument—all to the ultimate effect that the juvenile court erred in continuing the plan of adoption. Mother emphasizes the fact that R has repeatedly expressed a desire to live with her and points to progress that she has made in her ability to parent him. DHS agrees that the juvenile court erred in continuing the plan of adoption, but it focuses on one specific issue—the unlikelihood of adoption given R's significant behavioral problems. "For that reason," DHS argues, the court erred in continuing the plan of adoption. The only other party below, child, has not appeared on appeal.[4]

---

[3] Later in December 2018, the juvenile court took jurisdiction of R on an additional basis, resulting in two cases (with two case numbers), which the court consolidated. The court also ordered a plan of adoption in the second case. For simplicity's sake, because it is not relevant to the issues on appeal, we discuss the two cases as a single case.

[4] In the juvenile court proceedings, DHS and mother were aligned on the issue of changing the plan back to reunification, while child opposed that result. On appeal, DHS and mother remain aligned, and child has not appeared. As such, neither party who filed a brief on appeal defends the juvenile court's decision. Nonetheless, we cannot reverse the judgment unless we decide that the court erred. The situation is akin to one in which the respondent does not file a brief, *see L. D. v. T. J. T.*, 274 Or App 430, 431 n 1, 360 P3d 746 (2015) ("Guardians have

As a preliminary matter, we recognize the difficult decision that the juvenile court faced in this case. Mother is willing to parent and wants to parent R and, if he were not "exceptionally difficult to parent," she might be able to do so, just as she is currently parenting R's younger brother without DHS involvement. However, given R's high needs, mother cannot yet parent R safely, despite years of services, and the juvenile court found that mother would not be able to parent R safely in a reasonable time. Meanwhile, R has been in the state's care for four years, which is nearly half his lifetime, and he needs permanency. The plan that the court believed would be best for him—a guardianship or other permanent placement with his current foster parents—has proved unachievable. In December 2018, the juvenile court decided that the time had come to change the plan to adoption, and it continued that plan in February 2019.

On appeal from a permanency judgment, we view the evidence in the light most favorable to the juvenile court's disposition to determine if the evidence supports the court's legal conclusions, and we review the court's legal conclusions for errors of law. *Dept. of Human Services v. S. J. M.*, 364 Or 37, 40, 430 P3d 1021 (2018). As relevant here, under ORS 419B.498(2)(b), DHS is required to file a petition to terminate parental rights when a child has been in substitute care for 15 of the most recent 22 months, unless an exception applies, and one of those exceptions is when there is a "compelling reason" documented in the case plan to determine that filing a petition would not be in the child's best interests. We have held that, if such a compelling reason exists, "the permanency plan cannot be changed to adoption." *S. J. M.*, 364 Or at 39-40. And we have implicitly recognized that, if such a compelling reason exists, a plan of adoption cannot be continued. *See Dept. of Human Services v. M. H.*, 258 Or App 83, 85, 308 P3d 311 (2013) (reversing permanency judgment that continued a plan of adoption because the juvenile court failed to include a "compelling reason" determination in the judgment).

not appeared on appeal, and, pursuant to ORAP 5.60, the matter was submitted on its merits as to them."), or in which the state concedes error, *see Cervantes v. Dept. of Human Services*, 295 Or App 691, 693, 435 P3d 831 (2019) ("We are not bound to accept [DHS's] concession and must decide whether to accept it.").

"Whether a 'compelling reason' exists is a legal question, but one dependent on factual findings." *S. J. M.*, 364 Or at 56. As the Supreme Court recently explained, the proper question on review is "whether there was evidence in the record to support the juvenile court's findings of fact upon which its conclusion \*\*\* that there was not a 'compelling reason' was based." *Id.* at 56-57. In this case, after careful review of the record, we cannot say that there is no evidence in the record to support the findings upon which the juvenile court based its "compelling reason" conclusion. At the same time, the issue of R's adoptability is a serious one that warrants written discussion. Both DHS and mother argue that the juvenile court erred in continuing R's plan as adoption because it is unlikely that adoption can be achieved.

In *State v. L. C.*, 234 Or App 347, 357, 228 P3d 594 (2010), *rev dismissed*, 349 Or 603 (2011), we reversed a judgment changing two sisters' permanency plans to adoption where, on the record, "it appear[ed] that a suitable adoptive placement for the children [was] unlikely to be found." Given the age of the children, their history, their high needs, and DHS's unsuccessful recruitment efforts—which included "using all the recruitment resources possible, including things we don't typically use this early in recruitment for kids"—DHS was "unable to conclude that it [could] successfully place and maintain the children in any adoptive placement." *Id.* at 351. The juvenile court was somewhat critical of DHS's legal position, but it did not find that a suitable adoptive placement was likely to be located. *Id.* at 352. In those circumstances, we recognized that the legislature seemed to have "intended the termination of parental rights to result in the creation of a new parent-child relationship through adoption." *Id.* at 353. Regarding the "compelling reason" statute in particular, ORS 419B.498(2), we noted that it was "difficult to see how a permanency plan of adoption would be better suited than other permanency plans \*\*\* to meet the ward's needs if an actual adoption is unlikely." *L. C.*, 234 Or App at 353. "A permanency plan of adoption implicitly requires some likelihood that adoption will be achieved." *Id.* at 354.

As we have since clarified, "*L. C.* does not stand for the proposition that DHS must have a plan of adoption by a current caretaker to whom [a child] has an attachment," but

it does stand for the proposition that a child's permanency plan should not be changed to adoption "where there is persuasive evidence that adoption is unlikely to be achieved." *Dept. of Human Services v. T. M. S.*, 273 Or App 286, 296, 359 P3d 425 (2015). Applying that standard in *T. M. S.*, we concluded that the juvenile court did not err in changing a child's plan to adoption where the mother's arguments about the unlikelihood of adoption were "speculative and not supported by evidence in the record" and where out-of-state relatives had expressed an interest in adopting the child. *Id*.

On the current record, the evidence that R is unlikely to achieve adoption is stronger than that in *T. M. S.* but not as strong as that in *L. C.* First, importantly, at the hearings that resulted in the challenged permanency judgment, neither DHS nor mother put on any direct evidence regarding the present likelihood of R being able to achieve adoption. That alone distinguishes this case from *L. C.* Second, the indirect evidence is not so clear as to require a singular inference "that adoption is unlikely to be achieved." *T. M. S.*, 273 Or App at 296. On the one hand, R has a long history of violent and dysregulated behavior,[5] and he is emotionally bonded to mother and has repeatedly expressed a desire to live with her. Such considerations led the juvenile court to conclude repeatedly, until as recently as October 2018, that adoption was not an appropriate plan for R. On the other hand, R's foster mother testified at the most recent hearing that at least some aspects of R's behavior had improved recently (although others may have gotten worse), and a DHS caseworker testified that R was "making really good progress" academically. More importantly, mother had recently identified her half-brother (R's uncle), who lives in Washington, as someone willing to be an adoptive resource

_____

[5] On appeal, DHS provides a list of cites to various parts of the record in support of the proposition that R is unlikely to achieve adoption. Upon examination, however, some of that evidence pertains to R's behaviors in 2017 and earlier, and other evidence is not tied to a particular timeframe and may or may not be current. There *is* evidence that (1) as of March 2018, a DHS caseworker did not believe that adoption was a viable plan for R given his behaviors; (2) around June 2018, R jumped off a piece of furniture while refusing to go to bed, landed on his foster father's foot (intentionally or accidentally), and broke his foster father's toe; and (3) R has continued to be destructive of property and to require very substantial supervision. We are unprepared to say that the only possible inference from that evidence, as a matter of law, is that R is unlikely to achieve adoption.

for R. On this record, we cannot say that the juvenile court erred in continuing the plan of adoption.[6]

Affirmed.

---

[6] As previously mentioned, mother raises seven assignments of error, all of which challenge the juvenile court's continuation of the plan of adoption or aspects thereof. We have considered each of mother's assignments of error and reject without written discussion those that are not addressed directly herein.