Submitted on record and briefs December 12, 2005, reversed March 8, 2006

In the Matter of
Deion Christian Crook Williams,
aka Deion Crook Williams,
aka Deon Crook Williams,
a Minor Child.

STATE ex rel JUVENILE DEPARTMENT
OF COOS COUNTY,
*Respondent,*

*v.*

Tony WILLIAMS,
*Appellant.*

JV9473; A128226

130 P3d 801

George W. Kelly filed the brief for appellant.

Hardy Myers, Attorney General, Mary H. Williams, Solicitor General, and Seann C. Colgan, Assistant Attorney General, filed the brief for respondent.

Before Landau, Presiding Judge, and Ortega, Judge, and Breithaupt, Judge pro tempore.

ORTEGA, J.

**ORTEGA, J.**

Father appeals from a judgment entered by the juvenile court after a permanency hearing involving his six-year-old child. In the judgment, the trial court found that the Department of Human Services (DHS) had made reasonable efforts to safely return child home and ordered DHS to proceed with the plan of achieving adoption, and father now assigns error to that finding. On *de novo* review, ORS 419A.200(6)(b), we conclude that DHS did not make reasonable efforts and therefore reverse.

We begin by summarizing the events leading up to the permanency hearing. Our focus is solely on the events relevant to father and father's appeal, apart from mother's extensive involvement with the agency.

In April 2004, father was arrested and charged with attempted murder, Assault I, Assault II, tampering with physical evidence, and possession of a controlled substance. Father was eventually acquitted of all charges except the tampering and possession charges. Father was in custody from the time of his arrest until his trial in August 2004.

Shortly after father was arrested, in early May 2004, child was taken into police custody and placed in foster care. A dependency petition was filed because mother had left child in a motel with another adult and failed to return. A primary permanency plan for child to "[r]eturn to a parent" was established, along with a concurrent plan to "[a]chieve [a]doption."

As noted, at the time of child's removal father was in jail. DHS apparently contacted father soon after child's removal, as evidenced by a service plan signed by father dated May 18, 2004—but the only action the service plan required of father was to contact DHS on his release. At a hearing in July, father's counsel requested that DHS contact father in jail and noted that father had not been offered any services.

At the conclusion of father's criminal trial in August, the trial court sentenced father to probation. Two weeks after his release, however, father violated his probation by failing

to meet with his probation officer, and his probation was revoked about two weeks after that violation. During that month of probation, father did not contact DHS; he apparently tried to call when he was returned to custody but did not get through because DHS would not accept a collect call. Father remained in jail throughout the rest of the relevant juvenile proceedings.

A dispositional review hearing in this matter occurred a few months after father's return to jail. At the hearing, father's attorney again requested that DHS contact father in jail and also expressed father's willingness to participate in services. DHS apparently made no contact with father until it sent him a "letter of expectation" three months later. The letter reminded father that he should contact DHS on his release and added that he should "continue involvement in any available programs at the jail."

Father had already been participating in all the programs offered at the jail, including Parenting and Forgiveness classes and meetings for Narcotics Anonymous, Alcoholics Anonymous, and Setting Addicts Free for Eternity (S.A.F.E.). He also completed his GED and applied to Southwestern Oregon Community College, worked through 24 booklets on Roadmap to Change-Interactive Journaling, and met weekly with a pastor.

Throughout the juvenile proceedings, DHS submitted lengthy reports to the court that focused primarily on mother and her progress while only intermittently mentioning father. For example, in an initial report DHS wrote, "[Father] has been in and out of [child's] life. Currently he is in jail [with] trial set for August." A later report indicates:

"At the time of [child's] placement * * * [father] was in jail * * * [but later was] found not guilty. [Father] has not been in contact with [DHS] since his release.

"Because * * * father[ ] * * * [is] not working with [DHS], it's highly unlikely that [child] will return to [him]. If this were to occur, contact would need to be made and a service plan developed."

Again, months later, DHS reported, "This caseworker has not had any contact with [father]. * * * It is concerning that * * *

father has [not] contacted this caseworker * * *." Even though DHS was aware of father's return to prison, at least as of the dispositional review hearing, its reports incorrectly list his address as "Whereabouts Unknown."

The permanency hearing that resulted in the judgment from which father now appeals occurred on March 31, 2005. At that time, father was set to be released about three and a half months later. At the hearing, DHS's report recommended that the court find that reasonable efforts had been made to make possible child's safe return home and that the court should switch the plan from "[r]eturn to a [p]arent" to "[a]doption." To justify its assertion that reasonable efforts had been made, DHS listed several services provided to and contacts made with mother. For father, however, the report noted only three contacts, the dates of which correspond to the prior hearing dates. The juvenile court ruled that reasonable efforts had been made and switched the plan to adoption.

Before discussing the substance of father's appeal, a brief explanation of the relevant statutory scheme is appropriate. It is the policy of the State of Oregon to offer "appropriate reunification services" to parents when a child has entered protective custody and a dependency petition has been filed. ORS 419B.090(4). Pursuant to that policy, DHS generally is required to make "reasonable efforts" to make possible a child's safe return home while the dependency case is pending. ORS 419B.340(1); ORS 419B.476(2)(a). To ensure compliance, the juvenile court is required to determine whether DHS has satisfied that mandate at both the dispositional hearing, which generally occurs 60 days after the petition is filed, and the permanency hearing, which generally occurs 12 months after the petition is filed. ORS 419B.305(1); ORS 419B.340(1); ORS 419B.470(2); ORS 419B.476(2)(a). However, there are exceptions to the "reasonable efforts" requirement. At the dispositional hearing, a court may excuse DHS from making further reasonable efforts if one of the circumstances listed in ORS 419B.340(5) exists:

"If a court determines that one of the following circumstances exist, the juvenile court may make a finding that

the department is not required to make reasonable efforts to make it possible for the ward to safely return home:

"(a)   Aggravated circumstances including, but not limited to, the following:

"(A)   The parent by abuse or neglect has caused the death of any child;

"(B)   The parent has attempted, solicited or conspired * * * to cause the death of any child;

"(C)   The parent by abuse or neglect has caused serious physical injury to any child;

"(D)   The parent has subjected any child to rape, sodomy or sexual abuse;

"(E)   The parent has subjected any child to intentional starvation or torture;

"(F)   The parent has abandoned the ward * * *; or

"(G)   The parent has unlawfully caused the death of the other parent of the ward;

"(b)   The parent has been convicted in any jurisdiction of one of the following crimes:

"(A)   Murder of another child of the parent * * *;

"(B)   Manslaughter in any degree of another child of the parent * * *;

"(C)   Aiding, abetting, attempting, conspiring or soliciting to commit an offense described in subparagraph (A) or (B) of this paragraph; or

"(D)   Felony assault that results in serious physical injury to the ward or another child of the parent; or

"(c)   The parent's rights to another child have been terminated involuntarily."

Father here challenges the juvenile court's conclusion that DHS had made reasonable efforts to make possible child's safe return home. Relying primarily on *dictum* from one of our prior decisions, *State ex rel Juv. Dept. v. Dee*, 19 Or App 193, 526 P2d 1036 (1974), the state responds that DHS's efforts were reasonable because father was incarcerated during almost the entire period of these proceedings and was

therefore beyond the reach of reasonable efforts. In other words, the fact that DHS did not provide services to father while he was in prison, or make any meaningful contact with him for that matter, was reasonable "precisely because he was incarcerated." The state quotes our statement in *Dee* that "reasonable efforts by available social agencies * * * to effect a lasting adjustment * * * in the parent * * * cannot be attempted * * * if by his conduct [the parent] places himself in prison, beyond the reach of reasonable efforts." *Id.* at 196 (internal quotations omitted).

The court in *Dee* was addressing the reasonable efforts language in the former statute governing termination based on unfitness, *former* ORS 419.523(2)(e) (1973), *repealed by* Or Laws 1993, ch 33, § 373, which directed that "the court shall consider but is not limited to" an appraisal of the parent's

> "[l]ack of effort * * * to adjust his circumstances, conduct, or conditions to make the return of the child possible or failure of the parent to effect a lasting adjustment after *reasonable efforts* by available social agencies for such extended duration of time that it appears reasonable that no lasting adjustment can be effected."

(Emphasis added.) The pertinent language in the current version of the statute governing termination based on unfitness, ORS 419B.504(5), is essentially the same.[1] After concluding that a termination of parental rights could be affirmed based on the lack of effort by the father to adjust his circumstances, without regard to whether the state had engaged in reasonable efforts to effect the child's return home,[2] the court in *Dee* went on to make the comment, on which the state now relies, that reasonable efforts "cannot be attempted" where the parent's conduct "places [him] in

---

[1] Although *Dee* addresses the "reasonable efforts" language in the section addressing termination based on unfitness and this case involves the "reasonable efforts" language in the section addressing permanency, ORS 419B.476, the legislature's use of the same term through the juvenile code indicates that the term's meaning remains the same throughout. *See PGE v. Bureau of Labor and Industries*, 317 Or 606, 611, 859 P2d 1143 (1993).

[2] The father in *Dee* had been incarcerated for several years without making any attempt to contact his child. 19 Or App at 195.

prison, beyond the reach of reasonable efforts." 19 Or App at 196.

■ The state reads *Dee* to stand for the proposition that, when dealing with incarcerated parents, any efforts by the state are *automatically deemed reasonable*. That reading, however, is incorrect. The *dictum* in *Dee* stands, rather, for the proposition that reasonable efforts may be *excused* when the parent is incarcerated. The court's comment that "reasonable efforts * * * cannot be attempted * * * if * * * [the parent is] in prison," and that "[a parent] in prison [is] beyond the reach of reasonable efforts," *id.*, evinces the view that if a parent is in prison, social agencies ordinarily cannot, and therefore need not, make reasonable efforts.

Having clarified the proposition enunciated in *Dee*, we must address whether that *dictum* is correct. More specifically, can DHS be excused from reasonable efforts when the parent is incarcerated? We conclude that DHS cannot be so excused based solely on a parent's incarceration, without more, and that the proposition in *Dee* has since been abrogated by statute. To explain, some background information regarding significant post-*Dee* changes to Oregon's juvenile code is necessary.

In 1997, more than 20 years after our opinion in *Dee*, Congress enacted the Adoption and Safe Families Act of 1997 (ASFA). Pub L 105-89, 111 Stat 2115 (1997) (codified in scattered sections of USC titles 2 and 42). One of the purposes of ASFA was to eliminate barriers to the adoption of children in foster care. HR Rep No 105-77, 105th Cong, 1st Sess, *reprinted in* 1997 USCCAN 2739, 2739. One perceived barrier was a rigid federal requirement that states make "reasonable efforts" to facilitate returning children to their homes. *Id.* at 2740. To eliminate that barrier, ASFA required states to define, at their discretion, "aggravated circumstances," such as child torture or sexual abuse, in which states would be permitted to bypass the "reasonable efforts" requirement. 42 USC § 671 (1997). Additionally, states were required to bypass the reasonable efforts requirements under certain other circumstances, such as murder or manslaughter of a child. *Id.*

In response to ASFA, the Oregon legislature enacted Senate Bill (SB) 408 (1999), now codified in part as ORS 419B.340(5). As quoted above, that section sets out three categories of circumstances where a court may excuse DHS from making reasonable efforts to make possible the child's return home: (1) "[a]ggravated circumstances including, but not limited to" seven specified circumstances, ORS 419B.340(5)(a)(A) to (G); (2) a parent's conviction for certain criminal offenses, ORS 419B.340(5)(b)(A) to (D); and (3) the existence of a judgment involuntarily terminating a parent's rights to another child, ORS 419B.340(5)(c). The statute does not provide that reasonable efforts are *prohibited* under the specified circumstances, but rather that neither federal nor state law can mandate reasonable efforts when those circumstances exist. *See* Tape Recording, Joint House and Senate Judiciary Committee, SB 408, Mar 10, 1999, Tape 68, Side A (statement of Steve Christian, Senior Policy Specialist, National Conference of State Legislatures).

In light of those changes to the juvenile code, we conclude that the scheme enacted by the legislature establishes the circumstances in which DHS can be excused from making reasonable efforts to make possible a child's return home. Accordingly, the *dictum* from *Dee* survives only to the extent that it comports with ORS 419B.340(5). We therefore employ the methodology for statutory construction set out in *PGE v. Bureau of Labor and Industries*, 317 Or 606, 610-11, 859 P2d 1143 (1993), to interpret ORS 419B.340(5). Our task is to examine the text in context and, if need be, the legislative history, in order to determine whether the legislature intended to allow DHS to be so excused when a parent is incarcerated.

As we have noted, ORS 419B.340(5) addresses three general categories of circumstances under which DHS may be excused from making reasonable efforts—aggravated circumstances, convictions for certain crimes, and prior involuntary termination—the first two of which, in turn, list specific circumstances within the respective categories. Incarceration of the parent is not expressly addressed in the statute.

The question then becomes whether the legislature has enacted statutory wording that communicates an intention that the circumstances listed in the statute are exclusive. *See Oregonians for Sound Economic Policy v. SAIF*, 187 Or App 621, 630, 69 P3d 742, *rev den*, 336 Or 60 (2003). Here, the introductory clauses before the lists of general and specific circumstances in ORS 419B.340(5) demonstrate that the legislature intended exclusivity in some instances but not others. First, the clause introducing the three general circumstances provides, "If a court determines that *one of the following circumstances* exist," a court may make a finding that DHS is not required to make reasonable efforts. ORS 419B.340(5) (emphasis added). Likewise, the clause introducing the list of crimes that qualify (the second general circumstance) provides that a court may excuse DHS if the parent "has been convicted * * * of *one of the following crimes.*"[3] ORS 419B.340(5)(b) (emphasis added). However, as we have recognized previously, *State ex rel Juv. Dept. v. Risland*, 183 Or App 293, 307, 51 P3d 697 (2002), the list of "aggravated circumstances" (the first general circumstance) is not exclusive, as it "includ[es], but [is] not limited to" the examples listed. ORS 419B.340(5)(a). Therefore, a parent's incarceration for a crime not listed in the statute nevertheless could be a ground for excusing DHS, despite the lack of an explicit reference to incarceration in the statute, but only if the parent's incarceration constitutes an "aggravated circumstance" within the meaning of that term in ORS 419B.340(5)(a).

We analyzed the meaning of "aggravated circumstances" in *Risland*. There, we noted that the definition of the verb aggravate—" 'to make worse, more serious, or more severe : INTENSIFY' "—suggests that "aggravated circumstances" are those involving relatively more serious types of harm or detriment to a child. 183 Or App at 307-08 (quoting *Webster's Third New Int'l Dictionary* 41 (unabridged ed 1993)). As we explained, that interpretation is confirmed by the aggravated circumstances that are listed in the statute, including, among others, a parent having caused a child's death or serious physical injury or having subjected a child to

---

[3] Father was not incarcerated based on a conviction for one of the crimes listed in the statute.

rape or other sexual abuse, intentional starvation or torture, or abandonment. *Id.* at 308. Likewise in *Risland,* we found that aggravated circumstances existed within the meaning of the statute where the record indicated that, among other things, the child had suffered severe mental injury as a result of his exposure to significant domestic violence, the parents' drug use, and a highly unstable home life, and the parents' harmful actions and conditions that contributed to those problems persisted despite extensive efforts to remediate them before the court assumed jurisdiction. *Id.* at 308-09.

By contrast, nothing in the record here suggests that a parent's incarcerated status, without more, constitutes an aggravated circumstance within the meaning of ORS 419B.340(5)(a). Although a child is ordinarily harmed as a result of a parent's incarceration due to the parent's absence and consequent inability to act as a caregiver, that harm does not rise to the level of the harm described in *Risland* or the harm that would necessarily result from the circumstances expressly listed in the statute, such as being starved, tortured, or sexually abused.[4] Accordingly, our examination of the text of ORS 419B.340(5)(a) convinces us that incarceration of a parent, without more, is not an aggravated circumstance that may serve as a basis for excusing DHS from making reasonable efforts toward reunifying the family. To the extent that our *dictum* from *Dee* suggests a contrary result, we disavow it.

■ Having concluded that DHS may not be excused from making reasonable efforts in this case, we must address whether the trial court erred in concluding that the agency's efforts were reasonable. As we have explained previously,

"[t]he state is required to make reasonable efforts to assist parents in making the adjustments to enable them to become minimally adequate parents. The type and sufficiency of efforts that the state is required to make and whether the types of actions it requires parents to make are reasonable depends on the particular circumstances."

---

[4] At first glance, incarceration of a parent may seem to be included in the aggravated circumstance of abandonment. ORS 419B.340(5)(a)(F) ("[t]he parent has abandoned the ward"). However, the state has not contended that father abandoned child, so we do not address that argument.

*State ex rel SOSCF v. Frazier*, 152 Or App 568, 582, 955 P2d 272, *rev den*, 327 Or 305 (1998) (citations omitted). Accordingly, we examine the particular circumstances of this case to determine if DHS's efforts were reasonable.

The record indicates that, although DHS worked extensively with mother, its involvement with father was virtually nonexistent. Indeed, outside the courtroom, DHS appears to have communicated with father only twice—once early in the case when father signed a service agreement proposed by DHS (which did not, in fact, offer or suggest any services), and then later when DHS sent father a letter suggesting that he should continue with any services provided in the jail. Otherwise, those two communications merely instructed father to contact DHS on his release. DHS's reports barely mention father, except to list "face-to-face contacts" that appear to allude only to hearings in the case and to note that DHS had not contacted father and that father had not contacted the agency. This was so despite father's request that DHS contact him in jail (and it appears he could not contact them while incarcerated) and despite the fact that the agency apparently was aware that father was participating in various programs offered by the jail. Given father's relatively short incarceration, the lack of any information about his relationship with child, and his apparently imminent release from jail within four months of the permanency hearing, we conclude that DHS's efforts were not reasonable.

Because the reasonableness of DHS's efforts is dependent on the unique circumstances of a particular case, we decline to delineate exactly what types of actions would make DHS's efforts reasonable when a parent is incarcerated. Nonetheless, we note that, in this case, DHS could have engaged in any number of activities that it did not attempt and that might constitute reasonable efforts under some circumstances involving incarcerated parents. For example, DHS could have contacted father and investigated the history and extent of father's relationship with child. It could have assessed father's parental strengths and deficiencies. It could have explored services available to father during his incarceration, incorporated those services into a service agreement, and documented whether father participated in those services. It could have monitored father's progress

through his corrections counselor or another employee of the jail. It could have looked into whether visitation at the jail was possible and appropriate. It could have compared father's release date with the dependency case time lines and child's particular needs to determine whether reunification was possible within a reasonable time and, if so, it could have inquired into father's probable post-release situation and plan. In general, DHS could have attempted to engage and work with father. It completely failed to do so in this case.

Reversed.