Submitted October 25, 2016, reversed and remanded January 5, 2017

In the Matter of M. H.,
a Child.
DEPARTMENT OF HUMAN SERVICES,
*Respondent,*

*v.*

C. L. H.,
*Appellant.*

Linn County Circuit Court
14JU03185;
Petition Number J140301;
A162133

388 P3d 1214

Shannon Storey, Chief Defender, Juvenile Appellate Section, and Amelia Andersen, Deputy Public Defender, Office of Public Defense Services, filed the brief for appellant.

Ellen F. Rosenblum, Attorney General, Benjamin Gutman, Solicitor General, and Inge D. Wells, Assistant Attorney General, filed the brief for respondent.

Before Duncan, Presiding Judge, and DeVore, Judge, and Garrett, Judge.

## GARRETT, J.

In this juvenile dependency case, father appeals the judgment of the juvenile court changing the permanency plan for his child, M, from reunification to adoption.[1] On appeal, father argues that the court erred in concluding that the Department of Human Services (DHS) made reasonable efforts to make reunification possible, a predicate for changing the permanency plan away from reunification. For the first six months after M was taken into protective custody, father did not participate in services, contact DHS, or attempt to visit M. Father then became incarcerated. Although DHS promptly learned of his whereabouts, DHS did not contact father or his prison counselor for more than six months. After that point, DHS's contact with father was minimal, and the agency did not assess the adequacy of programs in which father was participating in prison or provide education or training to father regarding M's special medical needs. We conclude that the juvenile court erred insofar as it failed to properly consider the benefit of providing father with additional services, and we agree with father that there was insufficient evidence to support the court's reasonable-efforts determination. Accordingly, we reverse the permanency judgment and remand the case to the juvenile court.

The parties do not request that we engage in *de novo* review under ORS 19.415(3)(b), and we do not identify a basis for exercising our discretion to do so. *See* ORAP 5.40(8)(c) (establishing that we will exercise our discretion to engage in *de novo* review "only in exceptional cases"). For that reason, we defer to the juvenile court's explicit findings of historical fact if those findings are supported by any evidence, and we assume that the juvenile court implicitly found predicate facts necessary to support its disposition. *Dept. of Human Services v. S. S.*, 278 Or App 725, 727, 375 P3d 556 (2016). We then "view the evidence, as supplemented and buttressed by permissible derivative inferences, in the light most favorable to the juvenile court's disposition and assess whether, when so viewed, the record was legally sufficient to

---

[1] Mother is not a party to this appeal. According to DHS, mother's parental rights as to M have been terminated.

permit that outcome." *Dept. of Human Services v. T. M. S.*, 273 Or App 286, 288, 359 P3d 425 (2015) (internal quotation marks and brackets omitted). We state the facts in accordance with that standard.

M was born in June 2014, and she was immediately placed in neonatal intensive care unit due to being born with a severe medical condition involving multiple intestinal atresias. She had two major surgeries following birth, was deemed a "medically fragile infant," and had to be fed through a feeding tube.[2]

DHS became involved with the family after hospital staff members reported that they had serious concerns that M's parents were unable to care for M in light of her serious medical condition and special needs. While in the hospital, mother and father "engaged in loud and aggressive conflict[s]" in M's hospital room, and, several times, "hospital staff heard banging in the room," but they were not able to identify the source of the noise. As to father, hospital staff documented that father visited M infrequently and for short periods of time, failed to feed M sufficiently or properly, failed to follow the directions of hospital staff with respect to M's needs,[3] did not console M when she was crying, was "verbally abusive" to M, and yelled at M and mother. At one point, hospital staff reported that father screamed at M to "[s]top [her] fucking crying." On another occasion, father and mother were removed from M's room by security officers out of concern for M's safety.

M remained in the hospital until she was placed in substitute care in October 2014. In November 2014, DHS scheduled visitation for father and M, and the agency notified father about the scheduled days and times. Father did not visit M. In December 2014, DHS reported that it had unsuccessfully attempted to contact father "numerous" times and had initiated an "absent parent search" to locate father.

---

[2] At the time of the permanency hearing, M continued to have high medical needs, although she was no longer being fed through a feeding tube at night.

[3] Those needs included feeding M orally as much as possible, monitoring M's intake and output, ensuring that M's temperature did not drop below the recommended level, maintaining M's diaper care regimen, and ensuring that there were no blankets loose in M's crib, among other things.

The juvenile court took jurisdiction over M in January 2015. Neither parent appeared at the jurisdictional hearing, and the court concluded that the state had made a *prima facie* showing sufficient to establish jurisdiction based on the allegations contained in the dependency petition. With respect to father, the dependency petition alleged that M "was born with a medical condition which requires specialized care and feeding needs that the father is unable or unwilling to meet," that "father has an anger control problem that interferes with his ability to safely parent [M]," and that "father failed to provide an adequate supply of food for [M]." In January 2015, in a disposition judgment, the juvenile court ordered father to participate in anger-management counseling and education "designed to address control of parental anger directed at children," age-appropriate parent training, specialized parent training, a safety plan, and services related to his lack of suitable housing.

M is a carrier of Methicillin-resistant Staphylococcus aureus (MRSA), a highly contagious bacterium. Consequently, M's foster parents went to great lengths to prevent the spread of the infection, such as bleaching the tub after M's baths, keeping separate towels for M, washing M's laundry separately, and wearing gloves for all diaper changes. In addition, M has a restricted diet; consumption of more than small amounts of sugar or fat cause her to experience diarrhea, increasing the risk of dehydration and MRSA transmission. M's foster parents also took steps to prevent M from pulling her feeding tube out, an occurrence that would cause the contents of her stomach to empty, which also created a risk of MRSA transmission.[4]

From October 2014, when M was placed in foster care, through March 2015, father did not visit M and did not participate in any court-ordered services. In March 2015, father was incarcerated and DHS discovered that he was in jail that month. Father was convicted of first-degree burglary and unlawful possession of methamphetamine, and in May 2015, he was sentenced to a prison term with a projected release date in April 2017.

---

[4] There is no indication that M will cease having special medical needs in the future.

DHS assigned Caseworker Yde to M's case in May or June of 2015. In May 2015, father sent a letter to DHS, but Yde did not receive it until after father had been transferred to a different prison facility.[5] Yde first spoke with father over the phone in November 2015, and she had four more phone conversations with father before the permanency hearing in March 2016. Yde never met with father in person. Father asked Yde to send him photos of M, and Yde sent black-and-white "printed out photographs" of M to father.

Yde provided father with some information about M's medical needs over the phone. Yde also contacted M's doctor to determine whether there was documentation describing M's condition that could be sent to father. The doctor informed Yde that "there was no curriculum or even *** a pamphlet" and referred Yde to "Wikipedia and Web M.D. websites for more information." Yde, however, did not provide information from those websites to father or develop a curriculum for father to help him prepare to meet M's needs. M's foster family sent Yde documentation about M's day-to-day care, but Yde did not forward that documentation to father.

Yde spoke to father's prison counselor for the first time in "late 2015." Yde asked father's prison counselor whether it would be possible for M to visit father in prison, but the counselor advised her that it was unlikely that a child with MRSA would be permitted to enter the facility. Regardless of the prison's restrictions, DHS determined that it would not be "appropriate" or in M's best interests for M to visit father in prison because the prison was five hours from her foster placement and potentially required an overnight stay. In Yde's view, in-person visitation would require a high level of care from M's foster parents because M's bodily fluids presented a risk of MRSA transmission.

On March 16, 2016, the juvenile court held a permanency hearing. DHS requested that the permanency plan for M be changed from reunification to adoption. Father

---

[5] At the permanency hearing, Yde testified that the letter "was making contact with [the previous caseworker]" and may have included a request for pictures of M.

opposed the change, arguing that DHS had failed to engage in reasonable efforts to make reunification possible.

At the permanency hearing, Yde testified that father's incarceration had "been an impediment for DHS to provide him services." Yde stated that, unless DHS had provided a special curriculum to father, "the only things" that were available to father were the programs in which he had participated—a "Parenting with Dignity" course, an anger-management course, and a basic first-aid course. The anger-management and parenting courses were shorter than similar programs that are available outside of prison, and DHS had not determined "the quality and appropriateness" of the programs in which father had participated. Yde testified that she was "unaware of all of the details of the different programs" relating to anger management, and she did not know whether father's anger-management course satisfied the court's order that father engage in programming focused specifically on parental anger.

Father testified at the hearing. He acknowledged that there were certain things that he did not know about caring for M, but explained that he was "willing to learn those things to take care of [his] daughter." He further testified that he had spoken with his prison counselor about potentially being moved to a different facility so he could have visitation with M more easily. Father testified that his prison counselor informed him that it was possible for DHS to get a doctor's recommendation that would permit father to travel for special programming provided by doctors that would focus on preparing father to provide for M's needs. Father testified that, in the time period prior to his incarceration, he was homeless and looking for employment.

DHS argued that the agency had made reasonable efforts to make reunification possible. DHS cited father's lack of apparent interest in M or in working with DHS during the first few months of M's life. DHS also argued that, even if DHS had stayed in regular contact with father and provided him with services during his incarceration, that would not have improved the chances that father would be reunified with M because he would not be able to sufficiently demonstrate his ability to care for M until after his release, which

was scheduled to occur more than a year after the permanency hearing. DHS urged the court to consider the length of father's prison term in deciding whether DHS had made reasonable efforts to make reunification possible.

In response, father argued that DHS's efforts were not reasonable, relying principally on DHS's failure to contact him in prison until November 2015 (roughly eight months after he was incarcerated), failure to inquire into what services were available to father in prison, and failure to even attempt to provide father with education or training calculated to prepare him to care for M's special needs. Father noted that he had completed a parenting program in prison before DHS had made contact with him or his counselor, demonstrating that he "was seeking to engage in whatever services he could while in custody."

The juvenile court changed the permanency plan from reunification to adoption. The court concluded that DHS had engaged in reasonable efforts with respect to father, relying heavily on our decision in *Dept. of Human Services v. S. W.*, 267 Or App 277, 289-95, 340 P3d 675 (2014) (affirming a juvenile court's reasonable-efforts determination with respect to an incarcerated parent despite an extended period in which DHS's efforts were "hardly vigorous"). The juvenile court found that, during the first six months of M's life, father "demonstrated little or no interest" in M, "did not visit regularly," "continued to engage in substance abuse and other illegal activity," and "did not follow through with any of the services ordered." The court concluded that DHS's efforts were "hardly vigorous but were minimally adequate," reasoning that "[i]t was not shown that more efforts by DHS would have made a significant difference in the outcome of the case."[6] The court acknowledged that DHS "failed to ascertain the content, quality, and sufficiency of the education programs father participated in and therefore failed to determine if they could develop additional curriculum that father could take advantage of in prison."

_____

[6] The court made findings that DHS had engaged in the following efforts applicable to father: "Supervised visits planned for both parents"; "Action agreements sent and signed by [mother and father]"; "Visitation referral provided for [father]"; "Face to face and phone contact with [father]"; "Ongoing contact with parent['s] attorney[]"; and "Paternity testing for [father] and [M]."

Nevertheless, the court reasoned that "there was no show-ing that such efforts would have advanced father's interest or accelerate[d] the reunification process." The court found Yde's "lack of familiarity with what occurred in the case and her failure to ascertain information about what is available to father in prison disappointing," but that it did not amount to a failure to make reasonable efforts. The court further reasoned:

> "When father is released from prison in April 2017, the child will be three years old, she will be closely bonded to her foster family and that family will be the only family she has ever known. Her parents will have no meaningful relationship with her, and that is not the fault of DHS or the result of the agency failing to make reasonable efforts.

> "In addition to any additional training father might need, he will need to establish a relationship with the child, visit the child frequently, and demonstrate sound parenting skills and control over his anger problem. This will take some time. By the time that all happens, absent any addi-tional training, the child will be approaching four years of age and will have been in substitute care for well over three years. The court has no basis to find that providing some form of enhanced training program in prison would make any significant difference to that."

The court additionally found that

> "DHS made reasonable efforts to assist both parents to adjust their conduct to the extent that was possible under circumstances that the agency cannot control. Those efforts were not active, were not robust, and were not as vigorous as the court would prefer to see, however the court cannot say they are not minimally reasonable under the circumstances."

On appeal, father renews his arguments from below. DHS defends the juvenile court's reasonable-efforts deter-mination on the ground that father was absent and unin-volved in the case from October 2014 until March 2015, and that legally sufficient evidence supports the juvenile court's conclusion that more effort by the agency following father's incarceration in March 2015 would not have made reunifica-tion between father and M possible.

"It is the policy of the State of Oregon * * * to offer appropriate reunification services to parents and guardians to allow them the opportunity to adjust their circumstances, conduct[,] or conditions to make it possible for the child to safely return home within a reasonable time." ORS 419B.090(5). In conformance with that policy, the juvenile court is authorized to change a permanency plan away from reunification only if DHS proves by a preponderance of evidence "that (1) it made reasonable efforts to make it possible for the child to be reunified with his or her parent and (2) notwithstanding those efforts, the parent's progress was insufficient to make reunification possible." *Dept. of Human Services v. S. M. H.*, 283 Or App 295, 305, 388 P3d 1204 (2017) (citing ORS 419B.476(2)(a)).[7] Once the juvenile court changes the permanency plan away from reunification, that "'change divests the parent of family reunification services as a matter of right from that time forward.'" *Dept. of Human Services v. T. L.*, 279 Or App 673, 680, 379 P3d 741 (2016) (quoting *Dept. of Human Services v. T. L.*, 358 Or 679, 691, 369 P3d 1159 (2016)). At that point, "'the parent's status as the preferred placement for the child is effectively terminated, unless and until the plan is changed at a subsequent permanency hearing.'" *Id.* (quoting *T. L.*, 358 Or at 693).

DHS's reunification efforts are reasonable within the meaning of ORS 419B.476(2)(a) only if DHS has given a parent a fair opportunity to demonstrate the ability to adjust his or her behavior and act as a "minimally adequate" parent. *S. M. H.*, 283 Or App at 305-06 (internal quotation marks omitted). DHS's efforts are assessed in the totality of circumstances, *Dept. of Human Services v. M. K.*, 257 Or App 409, 418, 306 P3d 763 (2013), with reference to the "adjudicated bases for jurisdiction," *S. S.*, 278 Or App at 738; *see also Dept. of Human Services v. N. T.*, 247 Or App 706,

---

[7] ORS 419B.476 provides, in relevant part:

"(2) At a permanency hearing the court shall:

"(a) If the case plan at the time of the hearing is to reunify the family, determine whether the Department of Human Services has made reasonable efforts * * * to make it possible for the ward to safely return home and whether the parent has made sufficient progress to make it possible for the ward to safely return home. In making its determination, the court shall consider the ward's health and safety the paramount concerns."

715, 271 P3d 143 (2012) ("The particular issues of parental unfitness established in the jurisdictional judgment provide the framework for the court's analysis of each question— that is, both DHS's efforts and a parent's progress are evaluated by reference to the facts that formed the bases for juvenile court jurisdiction."). The juvenile court must evaluate DHS's efforts over the entire duration of the case, "with an emphasis on a period before the hearing sufficient in length to afford a good opportunity to assess parental progress." *S. S.*, 278 Or App at 735 (internal quotation marks omitted). In evaluating whether to change the permanency plan away from reunification, the juvenile court must regard the child's health and safety as "paramount concerns." ORS 419B.476(2)(a).

Father argues that additional efforts by DHS, such as maintaining regular contact with father, educating father as to how to meet M's needs, and evaluating the services that were available to father in prison, "would have cost the department little but would have benefited both father and [M]." We have held that when, as here, a parent argues that DHS's failure to make specific efforts rendered the agency's efforts unreasonable, the juvenile court must engage in "something resembling a cost-benefit analysis," considering both the burdens that the state would shoulder in providing that service and the benefit that "might reasonably be expected to flow" from that service. *M. K.*, 257 Or App at 416, 418. In this case, the juvenile court concluded that DHS's efforts were reasonable despite making few efforts to ameliorate the jurisdictional bases by reasoning that additional efforts would not have "made a significant difference in the outcome of the case," relying on our decision in *S. W.*, 267 Or App at 293-94 (affirming the juvenile court's reasonable-efforts determination in part because there was no evidence that additional efforts "would have materially advanced [the father's] ability to reunify with [his child]").

We understand the "cost-benefit analysis" utilized by the juvenile court to rest primarily on its determination that, even if DHS had made all of the efforts that father argues that it should have made, those efforts nevertheless would not have made reunification between father and M possible in the near future. The juvenile court acknowledged

that DHS's efforts were "hardly vigorous" and that the case-worker's failure to even assess the programming available to father in prison was "disappointing." Nevertheless, the court reasoned that, by the time father was scheduled to be released from prison, M would be three years old and closely bonded to her foster family, and "that is not the fault of DHS or the result of the agency failing to make reasonable efforts." The court further reasoned that, even after father was released, it would "take time" for father to demonstrate that he could safely parent M, and there was "no basis to find that providing some form of enhanced training program in prison would make any significant difference to that." In essence, the juvenile court concluded that there would have been no "benefit" to DHS making additional efforts because, regardless, nothing that DHS could do would change the fact that father was and would continue to be incarcerated until almost a year after the permanency hearing.

In support of its conclusion, the juvenile court relied substantially on our decision in *S. W.* In that case, the child had "severe physical problems" and emotional problems, and the juvenile court took jurisdiction over the child based on findings that the father's substance-abuse problems placed the child at risk of harm and his incarceration compromised his ability to parent the child. 267 Or App at 280. Early in the case, DHS made substantial efforts toward ameliorating the jurisdictional bases. Specifically, the agency facilitated the father's transfer from prison to a drug treatment program, transported the father to that treatment program, arranged for in-person visits with the child, encouraged the father to participate in substance-abuse support groups, and provided the father with multiple consultations with DHS's Addiction Recovery Team. *Id.* at 280-81. In response to those efforts, the father showed a lack of interest in participating in support groups, failed to stay in contact with DHS upon his release from treatment, and missed an opportunity to visit his child at DHS's expense. *Id.* at 281. The father then committed new crimes and commenced a lengthy period of incarceration. *Id.* In the 33 months between the father's arrest and the permanency hearing, DHS made some efforts on the father's behalf, including sending him letters of expectations, calling him on the phone, encouraging

him to send letters to his child, and arranging for him to undergo a psychological evaluation. *Id.* at 289-90. Yet, in that 33-month period, despite requests from the father and the father's attorney, DHS failed to maintain regular contact with the father, declined to facilitate visits between the father and his child and did not contact his prison counselor until almost two years after the father's arrest. *Id.* at 283, 289. While in prison, the father participated in some programs, but he did not participate in substance-abuse support groups despite DHS's instruction to do so. *Id.* at 284. At a permanency hearing, the juvenile court determined that DHS had made reasonable efforts to reunify the father and his child. *Id.*

We affirmed. We acknowledged that DHS "could have done more" in the 33 months preceding the permanency hearing and that, "with little effort or expense," DHS could have contacted the father more regularly and communicated with prison officials about the father's ability to participate in services while in prison. *Id.* at 289-90. Nevertheless, we concluded that the juvenile court had properly considered DHS's efforts over the life of the case, not just during the father's more recent period of incarceration. *Id.* at 290. We reasoned that, in light of DHS's efforts early in the case aimed at resolving the jurisdictional bases, the father's poor response to those efforts, the child's special needs, and the father's failure to demonstrate an interest in his child for most of his time in prison, sufficient evidence supported the juvenile court's reasonable-efforts determination. *Id.* at 291-94. We reasoned that, even if DHS had contacted the father more regularly or facilitated visits between the father and his child, father did not explain how such efforts would have "materially advanced his ability to reunify with [his child]" because the "primary impediment to [the] father's reunification with [his child] has been his pattern of criminal conduct" that led to his incarceration. *Id.* at 293. We also emphasized that the juvenile court could properly consider the "[f]ather's failure to demonstrate much, if any, interest in [his child] throughout most of [the] case" when evaluating whether additional efforts would have made a difference. *Id.* at 294. Thus, in *S. W.*, we affirmed in large part because the juvenile court had evidence from a period of several

years bearing upon the father's responsiveness to efforts by DHS from which it could assess whether additional efforts would have ameliorated the jurisdictional bases. Applying a "cost-benefit" analysis, we concluded, in light of that body of evidence, that there was evidence to support a conclusion that the efforts that DHS did not make would not have improved the conditions that led to the father's recurring incarceration.

In this case, the juvenile court appears to have interpreted *S. W.* to stand for the proposition that DHS is only required to make minimal efforts with respect to an incarcerated parent so long as DHS's failures did not prevent the parent from making sufficient progress, and any efforts on the agency's part would not change the fact of that parent's incarceration. We reject that interpretation of *S. W.* for several reasons. First, that interpretation misconstrues what is meant by "benefit" when a court undertakes the "cost-benefit analysis" that applies in these circumstances. *See M. K.*, 257 Or App at 418. Second, such an interpretation conflates the separate "reasonable efforts" and "sufficient progress" inquiries required by ORS 419B.476(2)(a). Finally, the result in *S. W.* was heavily fact-dependent and is materially distinguishable from this case.

We first turn to our decision in *M. K.*, in which we described the "cost-benefit" analysis that is required when a parent challenges DHS's failure to offer specific reunification services. In *M. K.*, the juvenile court took jurisdiction based on the father's incarceration, the fact that he was an untreated sex offender, and his inability to maintain a relationship with his child. 257 Or App at 412. DHS determined that visitation between the father and the child was important to reunification but that the father would first need to participate in a psychosexual evaluation. *Id.* at 413. After DHS learned that conducting the evaluation in prison would cost five times as much as an evaluation outside prison, DHS delayed in providing the evaluation. *Id.* at 413-14. Even though DHS characterized the evaluation as "key" to the reunification process, the juvenile court nevertheless determined that it was reasonable for DHS to delay in providing the evaluation due to its high cost. *Id.* at 413-15.

We reversed, holding that the juvenile court had failed to consider all of the pertinent circumstances, which included both the burdens that the state would shoulder in providing the evaluation *and* the potential benefit that "might reasonably be expected to flow" from providing that service promptly. *Id.* at 416. We framed the proper reasonable-efforts inquiry as follows:

> "[A] court must consider the *totality* of the circumstances, including both the costs associated with providing services and whether the parent is likely to benefit from services in a way that would increase the chances of family reunification. Put bluntly, when a parent contends that DHS's efforts have not been reasonable because the agency has declined to provide a particular service, the court's 'reasonable efforts' determination should include something resembling a cost-benefit analysis, at least when—as here—the agency itself has deemed that service to be 'key' to the reunification plan."

*Id.* at 418 (emphasis in original). In assessing the potential benefit of the psychosexual evaluation, we cited evidence that administering the evaluation promptly "might lead to [the] father getting sex-offender treatment or could, instead, allow him to begin visitation with [his child] immediately," and "neither of those things [could] happen until [the] father receive[d] the evaluation." *Id.* at 418. We concluded that, "[g]iven the importance of the psychosexual evaluation to the reunification plan, the juvenile court should have considered the extent to which the family might benefit if [the] father [had] received a psychosexual evaluation promptly." *Id.* Thus, we interpreted the "benefit" of providing the evaluation in terms of its importance to the case plan and the potential magnitude of its effect on the jurisdictional bases. Our analysis did not hinge on the probability that the service would *actually* facilitate reunification.

Following *M. K.*, in *Dept. of Human Services v. J. M.*, 275 Or App 429, 364 P3d 705 (2015), *rev den*, 358 Or 833 (2016), we concluded that the juvenile court did not err in its reasonable-efforts determination despite DHS's failure to provide a service to the parents directed at ameliorating the jurisdictional bases. In that case, the juvenile court took jurisdiction based on, among other things, a finding that

the parents' lack of parenting skills impaired their ability to provide minimally adequate care to their child. *Id.* at 432. After DHS took the child into protective custody, testing revealed that the child exhibited developmental delays. *Id.* at 448. For at least six months, DHS neither informed the parents of the test results nor attempted to provide them with services related to the child's special needs. *Id.* When the child was subsequently diagnosed with autism-spectrum disorder, DHS notified the parents and provided training regarding their child's condition. *Id.* at 437-38. At that point, the parents showed some improvement in interacting with their child, but "did little to engage with the parental skills trainer" and failed to timely follow through with an online course about autism-spectrum disorder. *Id.* at 448-49. We concluded that sufficient evidence supported the juvenile court's reasonable-efforts determination. *Id.* at 449-50. We reasoned that, notwithstanding DHS's failure to promptly inform the parents about their child's condition, the agency's subsequent efforts and the parents' response to those efforts provided the juvenile court with evidence "specifically tied to [the] parents' willingness and ability to participate in services related to [their child's] special needs," along with "evidence about [the] parents' participation in other services from which it could infer that [the] parents would have gained little from six months of additional services targeting [the child's] special needs." *Id.* at 449. For that reason, we concluded that the juvenile court's reasonable-efforts determination was supported by sufficient evidence, despite the fact that DHS had declined to provide a service that was closely tied to the jurisdictional bases.

Thus, our cases support the proposition that, in assessing the "benefit" portion of the required cost-benefit analysis, the juvenile court must consider the importance of the service that was not provided to the case plan and the extent to which that service was capable of ameliorating the jurisdictional bases. *See, e.g., M. K.*, 257 Or App at 418; *see also N. T.*, 247 Or App at 715 ("[B]oth DHS's efforts and a parent's progress are evaluated by reference to the facts that formed the bases for juvenile court jurisdiction."). Further, when available, the juvenile court also properly considers evidence tied to a parent's willingness and ability

to participate in and benefit from the particular service that was not provided. *See, e.g., J. M.*, 275 Or App at 448-49; *S. W.*, 267 Or App at 293-94. However, contrary to the juvenile court's approach in this case, an assessment of the "benefit" of a particular service does not turn upon whether that service will ultimately make reunification possible. While a juvenile court may consider the "length and circumstances of a parent's incarceration" in assessing DHS's efforts, *see, e.g., id.* at 294, the reasonable-efforts inquiry focuses on whether DHS provided the parent with an *opportunity* to demonstrate improvement regarding the jurisdictional bases, *see M. K.*, 257 Or App at 417 (explaining that "DHS must at least attempt to engage and work with parents, even those who are incarcerated," in order to "give the parents a reasonable opportunity to demonstrate their ability to adjust their conduct and become minimally adequate parents" (internal quotation marks and brackets omitted)).

Put another way, our cases do not stand for the proposition that DHS may withhold a potentially beneficial service to an incarcerated parent (or any parent) simply because, in DHS's estimation, reunification with the child is ultimately unlikely *even if* the parent successfully engages in the services and programs that DHS provides. Such a proposition is inconsistent with ORS 419B.476(2)(a), which treats evaluation of the agency's efforts as a distinct inquiry from whether the parent has made "sufficient progress" to make reunification possible. *See Dept. of Human Services v. N. M. S.*, 246 Or App 284, 294, 266 P3d 107 (2011) (explaining that the "reasonable efforts" inquiry focuses on DHS's efforts with respect to the "the particular issues of parental unfitness alleged in the dependency petition" for a period "sufficient in length to afford a good opportunity to assess parental progress," whereas "[p]arental progress is measured in terms of a parent's efforts toward remedying the barrier to reunification identified in the dependency petition and the applicable case plan" (internal quotation marks and ellipses omitted)). The agency must make reasonable efforts *so that* the juvenile court is in a position to evaluate the parent's progress toward the goal of reunification. *Cf. S. S.*, 278 Or App at 736-37 (assessing DHS's efforts in terms of whether the agency made efforts for a sufficient

period of time "to allow the court to meaningfully assess whether the family was making progress toward reunification"). Although a court appropriately considers a parent's responsiveness when assessing the choices that DHS made with respect to that parent, in most circumstances, whether a parent "has attempted to make appropriate changes," *Dept. of Human Services v. D. W. C.*, 258 Or App 163, 171, 308 P3d 316 (2013), or is "likely to be able to parent [the child] within a reasonable time," *Dept. of Human Services v. A. S.*, 278 Or App 493, 501, 380 P3d 319 (2016), bears primarily upon whether the parent has "made adequate progress toward reunification"—not on the reasonableness of DHS's efforts, *see Dept. of Human Services v. R. W.*, 277 Or App 37, 44, 370 P3d 543 (2016) (noting that a parent's failure to engage in services alone "is not one of the circumstances that legally excuses DHS from making reasonable efforts as to that parent").

The circumstances and duration of a parent's incarceration may well bear significantly on whether a parent is able to make "sufficient progress" as required by ORS 419B.476(2)(a). *See, e.g., Dept. of Human Services v. D. A. N.*, 258 Or App 64, 70, 308 P3d 303 (2013) (finding no error in the juvenile court's conclusion that a father made insufficient progress in part because the "father's incarceration made it difficult for him to satisfy his obligations under the action agreement," the resultant delay caused his child to remain in foster care for an extended period of time, and "that delay was at least partially attributable to [the] father's disciplinary record in prison"). However, those circumstances alone do not absolve DHS of its separate obligation, over the life of the case, to make reasonable efforts to give the parent the opportunity to ameliorate the bases for jurisdiction. *See State ex rel Juv. Dept. v. Williams*, 204 Or App 496, 500-01, 130 P3d 801 (2006) ("[I]ncarceration of a parent, without more, is not an aggravated circumstance that may serve as a basis for excusing DHS from making reasonable efforts toward reunifying the family."). Consequently, a juvenile court properly assesses the agency's efforts, and particularly the "benefit" of services that were not provided, in terms of their potential effect upon the jurisdictional bases, not in terms of whether, in

light of all the surrounding circumstances, reunification will ultimately be possible.

In this case, the services that DHS failed to provide—evaluating the anger-management and parenting programs available to father in prison and educating father on his child's special needs and day-to-day care—were directly related to the conditions that gave rise to jurisdiction (father's anger problem and his parenting deficiencies tied to M's medical problems). Furthermore, because DHS did not meaningfully attempt to provide those services or stay in regular contact with father once his whereabouts became known, the juvenile court had little evidence concerning father's willingness and ability to participate in and benefit from those services.[8] Thus, unlike in *S. W.*, the juvenile court did not have a body of evidence derived from an extended period of time demonstrating that there would be little "benefit" to DHS providing additional services to father. The fact that providing those services would not affect the length of father's incarceration or ultimately assure that M could be safely placed in father's care is immaterial to the "cost-benefit" analysis that is applicable in the reasonable-efforts determination (even though, as noted above, it may bear on the "sufficient progress" inquiry). Although, with respect to M's medical needs, the record shows that DHS would have to develop programming for father, DHS did not present evidence that doing so would be particularly burdensome, and the potential "benefit" of father gaining the skills to safely care for M is substantial. Accordingly, the juvenile court erred in its legal analysis by failing to consider all of the circumstances relevant to the "cost-benefit" analysis. *Cf. M. K.*, 257 Or App at 418-19 (concluding that the juvenile court erred by failing to consider the "totality of the circumstances related to the reasonableness of DHS's reunification efforts").

---

[8] Father's lack of participation early in the case did not categorically excuse DHS from making meaningful efforts for the remainder of the case, nor did it provide a sufficient period of time in which the juvenile court could conclude that any efforts on DHS's part would be fruitless. *Cf. S. M. H.*, 283 Or App at 308-09 (concluding that a parent's early resistance to DHS's efforts did not excuse DHS from making further efforts to ameliorate the jurisdictional bases); *R. W.*, 277 Or App at 44 (same).

Moreover, in light of DHS's failure to contact father or his prison counselor for more than six months, to investigate the adequacy of the programs available to father in prison, or attempt to provide father with services focused on M's special needs, we conclude that the record is insufficient to support a conclusion that DHS made reasonable-efforts toward father for a sufficient period of time in which the juvenile court could assess his progress. *Cf. S. M. H.*, 283 Or App at 310-12 (concluding that, even if DHS had made reasonable efforts in the months leading up to the permanency hearing, the agency's failure to contact the mother and her prison counselor for almost half a year rendered its efforts over the life of the case insufficient); *S. S.*, 278 Or App at 736-37 (concluding that four months of efforts by DHS was "too short" to allow the court to "meaningfully assess" parental progress in light of DHS's failure to make any efforts for six months); *State ex rel Dept. of Human Services v. H. S. C.*, 218 Or App 415, 427, 180 P3d 39 (2008) (concluding that DHS did not make reasonable efforts after failing to inquire into the programs that were available to an incarcerated parent and simply expecting the parent to comply with the existing case plan).

The record reveals that father faces significant obstacles to becoming a minimally adequate parent for M. Yet, his ability to work through those obstacles is appropriately assessed in terms of whether he has made "sufficient progress to make it possible for [M] to return home," not whether DHS should invest resources in him. After the agency has made reasonable efforts on father's behalf, the juvenile court may ultimately conclude that he has not made sufficient progress to make reunification possible, even if he actively participates in services. *See, e.g., Dept. of Human Services v. C. M. E.*, 278 Or App 297, 309-10, 374 P3d 969 (2016) (finding no error in a juvenile court's conclusion that a mother remained unable to safely parent her child despite her participation in the services that DHS offered); *Dept. of Human Services v. G. N.*, 263 Or App 287, 297, 328 P3d 728, *rev den*, 356 Or 638 (2014) ("Even if a parent has completed all services that have been required, evidence that a parent continues to engage in behavior that is harmful to a child supports a determination that the parent has not made

sufficient progress to make it possible for the child to return home."). The applicable permanency statute requires that, when a court considers whether to change the permanency plan away from reunification, the court must root its decision in considerations of M's "health and safety." *See* ORS 419B.476(2)(a) ("In making its determination, the court shall consider the ward's health and safety [as] paramount concerns."). Consequently, if M indeed becomes bonded to her foster parents, and father is unable to develop a relationship with her within a reasonable time, those facts will have a significant bearing on the sufficiency of father's progress. Until the agency makes meaningful efforts to provide father with reunification services, however, the juvenile court is not authorized the change the plan away from reunification and permit DHS to stop providing reunification services to father. *See T. L.*, 279 Or App at 680 ("The permanency plan set by the court determines whether DHS will continue to work to reunify the family * * *.").

Accordingly, because the juvenile court erred in its legal analysis, and there was insufficient evidence to support the juvenile court's reasonable-efforts determination, we conclude that the juvenile court erred in changing the permanency plan away from reunification.

Reversed and remanded.