DeVORE, J., dissenting.
This case poses the question whether DHS has failed to make reasonable efforts for a two-year old child to be returned to home, when his mother has died, his father is sentenced to imprisonment for years beyond his son's childhood, and DHS was slow in setting up telephone calls between the child and father in prison. The majority concludes that the efforts to return the child to home were not reasonable, particularly because DHS failed to ask father if he "had any ideas" about another caregiver or the conditions for a home environment. 290 Or.App. at 144, 413 P.3d at 1013. I disagree because neither before the juvenile court nor this court has father suggested any other caregiver; because, on the case presented, the juvenile court's analysis was sound; and because I fear that, in construing applicable standards, we forget the child's interest. I will address those points in reverse order.
*145 Oregon recognizes that children are individuals with legal rights that include "permanency with a safe family." ORS 419B.090(2)(a)(A) ; Dept. of Human Services v. T.L. , 279 Or.App 673, 677, 379 P.3d 741 (2016). When a child has been removed from a home, it is also Oregon's policy to offer parents appropriate reunification services to allow them the opportunity to adjust their conduct and the circumstances "to make it possible for the child to safely return home within a reasonable time ." ORS 419B.090(5) (emphases added). To "ensure that children do not languish in foster care," our statutes require the juvenile court to conduct a permanency hearing to develop or revise a permanency plan for the child. T.L. , 279 Or.App. at 679, 379 P.3d 741. The objective is that "children not be left indefinitely in a placement limbo." State ex rel . Juv. Dept. v. F.W. , 218 Or.App. 436, 469, 180 P.3d 69, rev. den. , 344 Or. 670, 189 P.3d 25 (2008). At a permanency hearing, the juvenile court has authority to change a plan from reunification, as here, to adoption, but only if DHS "has made reasonable efforts * * * to make it possible for the ward to safely return home" and, despite those efforts, the parent has not made sufficient progress to make it possible for the ward to safely return home. ORS 419B.476(2)(a). The same statute dictates, "In making its determination, the court shall consider the ward's health and safety the paramount concerns." Id .; see also Dept. of Human Services v. C.L.H. , 283 Or.App. 313, 323, 388 P.3d 1214 (2017) (reciting same). We have described those standards as reflecting "a child-centered policy orientation." F.W. , 218 Or.App. at 469, 180 P.3d 69. The standards are designed to achieve permanency for the child "as expeditiously as possible." Dept. of Human Services v. J.M. , 266 Or.App. 453, 461, 338 P.3d 191 (2014), rev. den. , 356 Or. 689, 344 P.3d 1111 (2015).
In this case, the juvenile court properly focused the inquiry. The court had taken jurisdiction as to father, not due to substance abuse, domestic violence, or anger management like so many other cases.[1] See, e.g. , C.L.H. , 283 Or.App. at 317, 388 P.3d 1214 (jurisdiction based on a father's anger control, failure to provide adequate food, and child's need for specialized care). The court had taken jurisdiction as to father based directly on the danger to Z of homelessness resulting *146 from father's incarceration itself-that is to say, father's inability to be a custodial resource. Father admitted that Z's welfare was endangered because "father has been convicted of sexually abusing another child and is incarcerated and currently unavailable to be a custodial resource." As a result, those "particular issues" provided the "framework" for the court's analysis. Dept. of Human Services v. N.T. , 247 Or.App. 706, 715, 271 P.3d 143 (2012).
Among other things, father complained that DHS had not contacted him in prison and had not made prison programs known to him. More particularly, he complained about DHS's delay in setting up the first telephone calls with Z, and he asked that the court order DHS to provide him with face-to-face visits. Father did not contend that he could ameliorate the risk of Z's homelessness-the *1015 risk posed by his incarceration-by suggesting another caregiver. Z was in the foster care of his maternal grandmother, where he was "doing really good." The paternal grandfather had not expressed interest in being a custodial resource. DHS had spoken with father, and father had not suggested the paternal grandfather as a custodial resource. Given that, the juvenile court framed the question that was actually presented to it, then answered it bluntly. The court stated:
"In making a reasonable efforts determination, the court assesses DHS's efforts based on a totality of the circumstances, 'including both the costs associated with providing services and whether the parent is likely to benefit from services in a way that would increase the chances of family reunification.' Dept. of Human Services v. M.K. , 257 Or.App. 409, 418 [306 P.3d 763] (2013). The efforts that DHS is required to make must be focused on ameliorating the bases of jurisdiction. Dept. of Human Services v. C.L.H. , 283 Or.App. 313, 322-23 [388 P.3d 1214] (2017). The basis of jurisdiction in this case is incarceration -for the next 29 years. What services could DHS provide that would ameliorate that basis? There is nothing that either DHS or [father] can do that could shorten the length of [father's] incarceration to make him available to parent [Z]."
(Emphases added.) As the majority notes, the juvenile court was justly alarmed that DHS had permitted delays in arranging periodic telephone calls between father in prison and his son. The court would respond to the visitation *147 complaint in its next ruling. But, in its letter decision on permanency, the juvenile court reasoned:
"For the purposes of changing a child's permanent plan, the efforts that DHS is required to make must be rationally related to ameliorating the basis of jurisdiction . To reject a change in plan and require DHS to provide to father a service that has no possibility of ameliorating the jurisdictional basis would fly in the face of a plain reading of the statute and require DHS to expend funds that cannot make reunification possible."
(Emphasis added.) The problem remained the basis of jurisdiction. That is, father's sentence meant that he was unable to provide a home for all of the years of Z's childhood. The juvenile court determined:
"Because visitation is not related to ameliorating the jurisdictional basis, I find that DHS's delay in setting up telephone visits does not affect this court's reasonable efforts finding. In fact, I find that there are no services or supports the DHS could have provided that could have ameliorated the jurisdictional bases as they relate to [father] in this case. Nor is there anything that [father] could have done to 'make progress' toward ameliorating the fact that he is incarcerated with a scheduled release date of December 9, 2046."
Due to the unusual length and circumstances of father's incarceration, the court concluded that DHS had employed reasonable services insofar as those that relate to the basis for jurisdiction. As to the circumstances of father's incarceration, the juvenile court added a finding of aggravated parental conduct. Under ORS 419B.340(5), a court may determine that DHS is not required to make reasonable efforts if it finds one of a number of aggravated circumstances, including the sexual abuse of any child.[2] The court found that *148 father had been convicted of first-degree sexual abuse and first-degree unlawful penetration, and, as a consequence, the court declared that DHS was relieved of responsibility to make efforts for the return of Z to father.
After those determinations, the court entered a permanency judgment that referred to a concurrent plan for adoption. The judgment that recited that plan included a diligent relative search and ongoing discussions with the current provider about being a long- *1016 term resource, presumably Z's maternal grandmother. Notwithstanding the adoption plan, the court subsequently entered a review judgment that directed DHS to begin Skype visits between father and Z.
In our review of this permanency judgment, the majority appropriately considers the principle from our seminal case about DHS's continuing responsibility to an incarcerated parent. In State ex rel . Juv. Dept. v. Williams, 204 Or.App. 496, 503, 130 P.3d 801 (2006), we held that DHS cannot be "excused based solely on a parent's incarceration, without more ." (Emphases added.) In that case, father had been acquitted of all charges but one, and he was scheduled to be released about three and a half months after the permanency hearing. Id . at 500, 130 P.3d 801. We concluded that, given the father's "relatively short incarceration, the lack of any information about his relationship with the child, and his apparently imminent release from jail within four months of the permanency hearing," DHS's efforts were not reasonable. Id. at 507, 130 P.3d 801 ; see also C.L.H. , 283 Or.App. 313, 388 P.3d 1214 (involving a father with a 23-month prison term where DHS failed to provide the programming that could have addressed the bases of jurisdiction with anger-management and parent programs).
We reached a different conclusion in Dept. of Human Services v. S.W. , 267 Or.App. 277, 340 P.3d 675 (2014), where the father was sentenced to 45 months in prison, DHS had made earlier efforts when he was not incarcerated, but DHS had done little while he was subsequently incarcerated. Father criticized the efforts as not reasonable due to failure to maintain a greater connection with him. We responded that
*149 "father does not explain how, even if DHS had more contact with prison officials or called father more frequently, that would have furthered the statutory objective of allowing [the child] to safely return home. * * * Nor is that a self-evident proposition, in light of father's lengthy incarceration at the time that [the child] needed stability and permanency."
Id. at 291, 340 P.3d 675 (emphasis added; internal quotation marks omitted). We recalled that, in considering whether the department's efforts were reasonable, the court is required to make the child's "health and safety the paramount concerns." Id . at 293, 340 P.3d 675. We reiterated, "Even if additional visits would have been desirable, father does not explain how they would have materially advanced his ability to reunify with [the child]." Id . We observed, "The fact that the statute requires DHS to make 'reasonable efforts' does not mean that the responsibility for developing a relationship between parent and child is the department's alone." Id. at 294, 340 P.3d 675. We recognized "that the length and circumstances of a parent's incarceration are factors that the juvenile court may consider in determining whether DHS has made 'reasonable efforts' to allow a child to 'safely return home.' " Id. (citing ORS 419B.476(2)(a) ). We determined:
"Thus, to prohibit the juvenile court from considering the length of incarceration in evaluating the reasonableness of DHS's efforts would be illogical, impractical, and inconsistent with the text of the statute, which expressly subordinates the question of 'reasonable efforts' to the 'paramount concern' of the 'ward's health and safety.' ORS 419B.476 (2)(a)."
Id. (emphasis added). We affirmed the permanency judgment that changed the plan from reunification to adoption.
Sadly, the facts in this case are more difficult than the precedents involving incarcerated parents. Here, father is sentenced to be incarcerated until Z is 32 years old. Thus, the juvenile court properly considered the length of the incarceration as important to the determination of reasonable efforts to reunify father and child. In addition, the juvenile court found that the aggravated circumstances of father's offenses are such that DHS does not need to make *150 further efforts to reunify.[3] Those things make this case *1017 much different than cases involving a parent with short-term incarceration.
Father was represented by counsel before the juvenile court and this court, and he did not intimate that DHS failed to make reasonable efforts because it did not ask him if he had "any ideas" for another caregiver. Nor did he offer one. Although DHS certainly bore the burden of persuasion as to reasonable efforts, DHS cannot be expected to disprove every unspoken negative. If there were a caregiver to assist father in raising the child, other than the paternal grandfather or maternal grandmother, then, to paraphrase S.W., it was not "the department's role alone" to suggest who that caregiver might be-who might provide the home that father cannot provide. It was father's role, too. But, he did not say he might have "other ideas," and he did not suggest anyone. Consequently, the juvenile court decided the case presented to it. And, it did so correctly. The court turned to adoption to find a home, with a plan making a "diligent relative search" with "ongoing discussions with [the] current provider about being a long-term resource." In doing so, the juvenile court did not err.
The majority reverses and remands in order that DHS may discuss with father whether he has "any ideas" how to satisfy the conditions of providing a home and caregiver "from the confines of prison." 290 Or.App. at 141, 413 P.3d at 1012. In doing so, we have done more than decide whether the juvenile court had substantial evidence to have found reasonable efforts. See Dept. of Human Services v. N.P. , 257 Or.App. 633, 639, 307 P.3d 444 (2013) (reviewing the evidence in the light most favorable to the juvenile court's disposition and assessing whether the record was legally sufficient to permit the outcome). When we remand to suggest DHS do something that even father did not ask-consideration of an unknown, alternate caregiver-we seem to exercise de novo review and without invitation. To do so is entirely unnecessary because father has the right, even after the *151 permanency judgment, to proffer an alternate caregiver, if there truly were one, with a motion to dismiss jurisdiction entirely. See T.L. , 279 Or.App. at 692, 379 P.3d 741 (doing so). Thus, in the end, what we really do is delay the permanency plan, delay adoption, delay the certainty and stability that a child needs, and elevate procedural criticism over the paramount interests of a child.
With appreciation for the sincerity of the majority and the importance of a father's relationship with his son, I respectfully dissent.

The court took jurisdiction as to mother due to substance abuse.

In part, ORS 419B.340(5) provides:
"If a court determines that one of the following circumstances exist, the juvenile court may make a finding that the department is not required to make reasonable efforts to make it possible for the ward to safely return home:
"(a) Aggravated circumstances including, but not limited to, the following:
"* * * * *
"(D) The parent has subjected any child to rape, sodomy or sexual abuse[.]"

Although I agree that the court's finding of aggravated circumstances is not retroactive, the finding nonetheless makes curious our remand for DHS to make up for missed efforts, when the juvenile court has made an unchallenged statutory determination that further efforts are not necessary.