Submitted December 19, 2019, affirmed April 8, 2020

In the Matter of A. C.,
a Child.

DEPARTMENT OF HUMAN SERVICES,
*Petitioner-Respondent,*

*v.*

C. S. C.,
*Appellant.*

Clackamas County Circuit Court
17JU10026, 18JU06568;
A171381 (Control), A171382

463 P3d 582

In these consolidated cases, father appeals a juvenile court judgment changing his child's permanency plan from reunification to adoption. Father argues that the juvenile court erred in concluding that the Department of Human Services (DHS) had made reasonable efforts to enable either father or mother to become a minimally adequate parent for their child. DHS responds that father's arguments with respect to mother are not preserved and that its efforts as to father were reasonable under the circumstances. *Held*: The juvenile court did not err. Father's arguments regarding DHS's services to mother are unpreserved. Although DHS's efforts with respect to father may have been less than ideal, the Court of Appeals concluded that they were sufficient to support the juvenile court's reasonable-efforts determination.

Affirmed.


Michael C. Wetzel, Judge.

Matthew J. Steven filed the brief for appellant.

Ellen F. Rosenblum, Attorney General, Benjamin Gutman, Solicitor General, and Shannon T. Reel, Assistant Attorney General, filed the brief for respondent.

Before DeVore, Presiding Judge, and DeHoog, Judge, and Mooney, Judge.

DeHOOG, J.

Affirmed.

**DeHOOG, J.**

In this juvenile dependency case, we address the familiar question whether reunification services provided to an incarcerated parent, although perhaps less than ideal, are nonetheless sufficient for purposes of a juvenile court's reasonable-efforts determination made in the course of changing a child's permanency plan to adoption. In a single assignment of error, father contends that the juvenile court erred in concluding that the Department of Human Services (DHS) has made reasonable efforts to enable either father or mother to become a minimally adequate parent for their child, A. DHS responds that father's argument as to the services it provided to mother are unpreserved and that its efforts as to father were reasonable under the circumstances. For the reasons that follow, we conclude that the record supports the juvenile court's reasonable-efforts determination and that it therefore did not err. Accordingly, we affirm.

Neither party has requested *de novo* review, and we do not view this to be an exceptional case warranting *de novo* review. *See* ORAP 5.40(8)(c). Thus, in this appeal, we review the juvenile court's permanency-plan rulings as follows:

> "[O]n appeal of a permanency judgment, the juvenile court's determination whether DHS's efforts were reasonable is a legal conclusion that we review for errors of law. In conducting that review, we are bound by the juvenile court's explicit factual findings if there is evidence to support those findings. To the extent that a court does not make its findings express, we presume that the court made any necessary implicit factual findings in a manner consistent with its ultimate legal conclusion. However, if an implicit factual finding is not necessary to a trial court's ultimate conclusion or is not supported by the record, then the presumption does not apply."

*Dept. of Human Services v. L. L. S.*, 290 Or App 132, 133, 413 P3d 1005 (2018) (internal brackets, citations, ellipses, and quotation marks omitted). We state the procedural history of the case and the relevant facts in accordance with that standard of review.

        The material facts are largely undisputed. In November 2017, one day after her birth, DHS removed A from parents' care based upon a variety of concerns, including mother's suspected methamphetamine use shortly before A's birth and ongoing safety concerns that had recently resulted in the juvenile court changing the permanency plans for A's two older siblings, C and L, from reunification to adoption. The dependency petition alleged, in relevant part, that "father's mental health issues interfere with his ability to parent safely" and that his "substance use and/or abuse escalate his anger issues, which interferes with his ability to parent safely." On January 18, 2018, father and mother admitted to certain amended allegations of the original petition, and the juvenile court took jurisdiction and placed A in the temporary custody of DHS. Father specifically admitted that (1) his "mental health issues[,] without treatment and medications[,] interfere with his ability to parent safely" and (2) he was "engaged in public safety court and is required to participate in UAs, mental health [treatment] including medications, and compl[y] with his probation and failure to participate interferes with his ability to safely parent."[1]

        Pursuant to A's initial plan of reunification, DHS provided various services to mother throughout the course of this case, some of which are described in greater detail below. And, for the first six months after the juvenile court took jurisdiction, DHS also provided father with services directed at the issues that he had admitted were interfering with his ability to safely parent A. The services provided to father included at least two supervised visits with A every week, parenting skills training, a neuropsychological evaluation, mental health counseling, and substance-abuse treatment.[2]

---

        [1] For her part, mother admitted that she "has mental health or cognitive impairment and without further treatment it interferes with her ability to safely parent," and that she "has substance abuse issues that she has been addressing but needs to continue treatment in order to remain sober or the child would be at risk of harm."

        [2] Father also received a recommendation that he attend batterer's intervention counseling, most likely directed towards allegations in the juvenile petition that mother had been subjected to domestic violence by father. DHS subsequently withdrew that allegation, however, and it appears to have played no further part in either parent's proceedings.

Several significant events occurred between the time of father's admissions in January 2018 and the juvenile court's ultimate decision to change A's permanency plan to adoption. First, in a separate dependency proceeding, the court terminated father's parental rights as to A's older siblings. As a result of that development, DHS filed a second petition regarding A, in which it alleged that father's parental rights to his older children had been terminated and that the conditions giving rise to that action—including mother's emotional, mental, or cognitive issues and father's corresponding failure to learn or assume sufficient parenting skills to safely raise the children—had not been ameliorated. Second, in July 2018, father was arrested for, among other things, burglary in the first degree and attempted first-degree rape. Father was subsequently convicted of those offenses and received a 60-month prison sentence. As a result, when the juvenile court changed A's permanency plan to adoption in April 2019, father had been incarcerated for nine months, and he had an anticipated release date of no earlier than July 2022. Third, pursuant to ORS 419B.340, the juvenile court had relieved DHS of its obligation to make reasonable efforts as to the second petition, although it did not relieve DHS of its obligations as to the initial petition.[3]

By the time of A's first permanency hearing in December 2018, father's visitation with A had ceased; further, father's visitation did not resume in any form before A's next permanency hearing in February 2019. In its December 2018 permanency judgment, the juvenile court concluded that DHS's reunification efforts had *not* been reasonable, because DHS had not provided mother with a family skills builder or parenting consultant with the requisite training, education, and experience to address "mother's cognitive and intellectual disabilities." The court did not, however, order DHS to provide any additional reunification services to *father*, nor did it order father to participate in any such services.

The juvenile court's decision to change A's permanency plan from reunification to adoption took place over

---

[3] Although DHS argued to the juvenile court that the order relieving it of further reunification efforts as to the second petition relieved it of *all* reunification efforts on behalf of both parents, it does not advance such an argument on appeal.

the course of two contested hearings held in February and April 2019. Mother participated in both days of the hearing and contested DHS's request to change A's plan, but she did not argue that DHS's reunification efforts had not been reasonable as to her.[4] Father also participated and contested the change in plan but, like mother, he did not argue that DHS had not made reasonable efforts as to her. Rather, he contended only that DHS had not met its reunification obligations as to him.

At the conclusion of the February 2019 hearing, the juvenile court concluded that DHS had made reasonable efforts as to both parents. In response to father's concerns, however, the court ordered DHS to "set up video visits between [A] and father," to "notify parents of all medical appointments," and to "provide parents with updates regarding [A] monthly." The court then continued the hearing until April and indicated that A's permanency plan would remain reunification until then.

The efforts that DHS made to comply with the juvenile court's February 2019 order and otherwise engage in reunification efforts on behalf of father were the subject of competing testimony in both February and April. For its part, DHS acknowledged its obligation to provide parents with information about A's health, her well-being, and the scheduling and results of any medical appointments she attended; DHS contended, however, that it had complied with that obligation. According to DHS's witnesses, both before and after being reminded at the February hearing of its duty to keep father informed, DHS had given father the required information "through discovery." DHS employees also testified to other efforts that DHS had made on father's behalf following his incarceration, including (1) providing for phone calls between father and A during mother's parenting time; (2) putting money in his prison account to facilitate video calls with A; and (3) calling father's prison counselor and writing the Department of Corrections to request that he be transferred to a facility close enough to A to allow for in-person visitation.

_____

[4] Mother is not a party to this appeal.

At one point in the hearing, father interjected that he had not gotten the required materials, and father's trial attorney separately observed that disclosing materials in discovery was not the same as providing it to father as ordered, an observation that the juvenile court later endorsed.[5] Counsel did not, however dispute having received the materials herself. Father also testified that, although he had twice been able to talk to A and her younger brother during mother's visitation sessions, on other occasions he had heard someone "kind of scream at [mother], tell her to get off the phone, [and tell her] it's not appropriate." Father testified that, in his view, DHS's efforts to promote visitation with A had fallen far short of expectations.

Despite father's arguments to the contrary, the juvenile court concluded at the April 2019 hearing that DHS's reunification efforts had been reasonable. The court observed that father was "making a great amount of progress under some difficult and challenging circumstances" and that he was commendably "learning a lot of great skills." Nonetheless, after observing that it had set "benchmarks" at the February hearing and that "we didn't hit the benchmarks; we didn't even come close," the juvenile court changed A's permanency plan to adoption. Father now appeals.

We begin with an overview of the relevant statutes and standards, none of which either party disputes on appeal. As the Supreme Court has explained, when a "juvenile court takes jurisdiction of a child, a series of complex statutes and proceedings come[s] into play." *Dept. of Human Services v. S. J. M.*, 364 Or 37, 50, 430 P3d 1021 (2018). Courts exercising dependency jurisdiction are subject to Oregon's underlying policy, which "recognizes that, even when parents are unable to care for their children for a period of time, there is a 'strong preference that children live in their own homes with their own families[.]'" *Id.* at 50-51 (quoting ORS 419B.090(5)). As a result, "DHS is obligated, except in cases involving 'extreme conduct,' to work with

---

[5] Specifically, the juvenile court told A's permanency worker "when I say, especially when somebody's in custody, that they're to get reports, that means directly from the [a]gency. And, if I didn't make that clear, I'm making that clear now."

families toward family reunification *at the outset.*" *Id*. at 51 (citing ORS 419B.090(5) and ORS 419B.502) (emphasis added). And the question whether, and for how long, DHS's obligation to make reunification efforts continues, is one that the juvenile court must decide under ORS 419B.476.

ORS 419B.476 governs permanency hearings. If, at the outset of a permanency hearing, a child's plan remains reunification of the family, the juvenile court must determine (1) whether DHS "has made reasonable efforts *** to make it possible for the ward to safely return home"; and (2) "whether the parent has made sufficient progress to make it possible for the ward to safely return home." ORS 419B.476(2)(a).[6] If DHS advocates for a change in the child's permanency plan, DHS must establish, by a preponderance of the evidence, both that it has made reasonable efforts towards safely reunifying the family and that the child's parents have nonetheless made insufficient progress for that to occur.[7] *Id*.; *Dept. of Human Services v. S. M. H.*, 283 Or App 295, 305, 388 P3d 1204 (2017).

To support a "reasonable efforts" finding, DHS must establish that it has provided a child's parents "a reasonable opportunity to demonstrate their ability to adjust their conduct and become minimally adequate parents." *Dept. of Human Services v. S. W.*, 267 Or App 277, 286, 340 P3d 675 (2014) (internal quotation marks omitted). When assessing whether DHS's reunification efforts have been reasonable, the juvenile court must consider those efforts over the life of the dependency case and in light of a parent's and child's specific circumstances, with the child's health and safety being the court's "'paramount concerns.'" *Id*. at 290 (quoting

---

[6] ORS 419B.476 provides, in relevant part:

"(2) At a permanency hearing the court shall:

"(a) If the case plan at the time of the hearing is to reunify the family, determine whether the Department of Human Services has made reasonable efforts *** to make it possible for the ward to safely return home and whether the parent has made sufficient progress to make it possible for the ward to safely return home. In making its determination, the court shall consider the ward's health and safety the paramount concerns."

[7] In this case, father does not contend that either he or mother has made sufficient progress to enable A safely to return home; accordingly, only the question whether DHS has made reasonable efforts to make reunification possible is at issue on appeal.

ORS 419B.476(2)(a)). Among other things, the court may consider a parent's own conduct and response to DHS's efforts to assist the parent in ameliorating the circumstances that gave rise to the juvenile court's jurisdiction. *S. W.*, 267 Or App at 290.

Notably, we have repeatedly observed "that the mere fact of a parent's incarceration does not excuse DHS from making the reasonable efforts required by the statute." *Id*. at 286-87 (citing *State ex rel Juv. Dept. v. Williams*, 204 Or App 496, 506, 130 P3d 801 (2006)). Rather, to the extent that a parent's incarceration affects either DHS's ability to provide a particular service to a parent or the likelihood that those efforts will advance the ultimate goal of reunification, that fact is merely part of the totality of the circumstances that the juvenile court must consider as part of its reasonable-efforts determination. *See S. W.*, 267 Or App at 286-87, 291 (citing *Dept. of Human Services v. M. K.*, 257 Or App 409, 416, 306 P3d 763 (2013), which explains that "a court making a 'reasonable efforts' determination must consider not only the burdens that the state would shoulder in providing [certain] services, but also what benefit might reasonably be expected to flow from them"); *see also Dept. of Human Services v. C. L. H.*, 283 Or App 313, 323, 388 P3d 1214 (2017) (noting that "the juvenile court must engage in something resembling a cost-benefit analysis" to determine whether failing to offer a specific type of service was reasonable (internal quotation marks omitted)).

Finally, because a parent's liberty interest in parenting "encompasses 'the fundamental right of parents to make decisions concerning the care, custody, and control of their children[,]'" reunification within the meaning of the juvenile code "is not limited to *physical* reunification." *L. L. S.*, 290 Or App at 138 (quoting *Troxel v. Granville*, 530 US 57, 66, 120 S Ct 2054, 147 L Ed 2d 49 (2000) (emphasis added)); *see also L. L. S.*, 290 Or App at 138 (acknowledging that, pursuant to ORS 419B.090(4), dependency statutes must be "'construed and applied'" consistently with the requirements of the federal constitution). Rather, "reunification of a child with a parent means the restoration of the parent's right to make decisions about the child's care, custody, and control without state supervision, even if the child

will not be returned to the parent's physical custody because of other impediments, such as incarceration." *L. L. S.*, 290 Or App at 138. With those guiding principles in mind, we turn to the parties' arguments.

As an initial matter, we address DHS's contention that father did not preserve his arguments regarding the services that DHS provided *mother*. We further consider—as we must in every case—whether father preserved *any* of his arguments for appeal, and not just his arguments as to mother's services. We note that father's single assignment of error asserts that "[t]he juvenile court erred when it found that DHS had provided *the parents* with reasonable reunification efforts and changed the permanency plan from reunification to adoption." (Emphasis added.) We similarly observe that, although father makes separate arguments under his assignment of error as to services provided to mother and services provided to him, he intertwines those arguments into a single conclusion: "Because the evidence shows that DHS's efforts were inadequate as to mother and 'virtually nonexistent' as to father[,] they were insufficient as a matter of law." Finally, father neither disputes DHS's contention that his argument about DHS's services to mother is unpreserved nor argues that his contention is reviewable as plain error.[8]

In our view, the question whether—and to what extent—father preserved his arguments for appeal depends on how we read them. One plausible reading is that DHS's services to mother were not sufficient and that, due *largely to that inadequacy*, the court erred in changing A's plan from reunification to adoption. A second reading could be that, *because DHS's reunification efforts to mother were insufficient*, they somehow rendered DHS's services *to father* inadequate as well. Either of those readings would lead us to conclude that father failed to preserve any argument for

---

[8] Notably, even the preservation section of father's opening brief does not suggest that *father* preserved his argument as to the sufficiency of DHS's services to mother. Rather, he quotes arguments by mother's counsel. Even assuming, however, that mother's argument could otherwise be viewed as preserving the issue for purposes of father's appeal, we note that neither the quoted argument nor any other of mother's arguments contends that DHS failed to make reasonable efforts as to her.

appeal, because both of those arguments are based on the adequacy of DHS's services to mother, which, as DHS points out, father never challenged.

We conclude, however, that, despite father's failure to preserve any argument specific to mother, he did preserve his ultimate argument; namely, that the juvenile court erred in changing A's permanency plan. That is, we understand father's argument in a third way, reading it to contend that the juvenile court's ruling changing A's plan to adoption was erroneous for *either* of two reasons, one rooted in the unpreserved argument that DHS provided insufficient services to mother, and the other rooted in the specifics of DHS's reunification efforts as to him. Thus, although we agree with DHS that father's argument as to the services DHS provided mother is not preserved—and we will not consider it further—we will proceed to consider father's argument as to the services DHS provided him.

Turning, then, to the merits of father's reasonable-efforts argument, we conclude for the reasons that follow that the juvenile court did not err. The crux of father's argument is that the fact of his incarceration did not relieve DHS of its obligation to make reasonable efforts on his behalf, and yet DHS's services to him were "virtually nonexistent" following his arrest and imprisonment. *See S. M. H.*, 283 Or App at 306 (a parent's incarceration does not end DHS's duty to provide reunification services); *Williams*, 204 Or App at 507-08 (DHS's efforts were not reasonable where, despite having provided extensive services to the child's mother, its involvement with the father was "virtually nonexistent").

Father acknowledges that we must evaluate the sufficiency of DHS's efforts over the entire duration of child's case and under the totality of the circumstances. *See S. W.*, 267 Or App at 291 (assessing reasonableness of efforts under the "totality of the circumstances"); *see also Dept. of Human Services v. S. S.*, 278 Or App 725, 735, 375 P3d 556 (2016) (evaluating DHS's efforts over the duration of the case, but emphasizing a period before the hearing "sufficient in length to afford a good opportunity to assess parental progress" (internal quotation marks omitted)). Father argues, however, that DHS's failure to contact him at all over the

first seven months of his incarceration renders its services inadequate as a matter of law. That is especially true, father reasons, because of his demonstrated willingness and ability to participate in services while in prison. *See S. M. H.*, 283 Or App at 308 (when evaluating the sufficiency of DHS efforts, a court may consider, among other factors, a parent's response to those efforts). As to what services DHS should have provided, father contends that DHS was required to (1) maintain contact with him regarding A's care and well-being; (2) facilitate visitation with A; and (3) provide him with an updated psychological evaluation due to both his recent sobriety and his discontinued use of psychiatric medications.

In response, DHS does not dispute father's view of the applicable law. It contends, however, that, viewed under the totality of the circumstances, the efforts that it made to help father become a minimally adequate parent were reasonable. First, DHS points out the various services that it provided to father following his incarceration, including the arrangements it had made for phone visitation, the money it had put in father's prison account, and its advocacy in favor of father being relocated to a facility closer to A.[9] Second, DHS notes that the reasonableness of its efforts is measured in relation to the basis or bases of the juvenile court's jurisdiction, which, in father's case, is the effect that his mental health has on his ability to safely parent A. *See Dept. of Human Services v. N. M. S.*, 246 Or App 284, 293-94, 266 P3d 107 (2011) (recognizing that the reasonable efforts "assessment is made on the basis of the case plan in effect at the time of the permanency hearing" (internal quotation marks omitted)). Finally, DHS argues that, in assessing the reasonableness of its services to father, we "must consider

---

[9] Although the parties give it little emphasis in its briefing, we note that, in its April 2019 permanency judgment, the juvenile court found that, over the course of A's case, DHS had provided father with a mental health evaluation and treatment or counseling, medication management, a substance abuse evaluation or treatment, urinalysis or other drug testing, transportation assistance, supervised visits, parenting training, and family counseling and skill building. *See, e.g.*, *S. W.*, 267 Or App at 291 (noting that, "although father's analysis ignores the initial efforts that DHS made on his behalf *** and father's conduct in response to those efforts, that evidence was part of the totality of the circumstances for the juvenile court to consider in evaluating the reasonableness of the department's efforts over the life of this case").

'whether the parent is likely to benefit from services in a way that would increase the chances of family reunification.' [*M. K.*, 257 Or App at 418]."

Viewing DHS's reunification efforts on behalf of father under the totality of the circumstances, we conclude that the services DHS provided, while perhaps less than ideal, were nonetheless sufficient to support the juvenile court's reasonable-efforts determination. Although we have concluded that father's argument regarding DHS's services to mother is unpreserved, it bears emphasizing that the focus of everyone's energy in this case—including father's—was on enabling *mother* to become a minimally adequate parent. Indeed, in arguing that DHS had not made reasonable efforts as to father, his attorney specifically argued,

> "I think there are specific services that can be offered to both parents, noting that [father] is not the custodial caretaker for [A], that the reality is that he's going to be in custody probably for at least 40 more months. But he has taken it upon himself *to be a cheerleader* for mother."

(Emphasis added.) Thus, even though father was advocating for additional contact with A and a better exchange of information with DHS, he did not suggest that he could, at least within the reasonable future, be a parental resource to A, *either* as a physical caretaker *or* as a "decision[maker] about the child's care, custody, and control." *L. L. S.*, 290 Or App at 138 ("reunification of a child with a parent means the restoration of the parent's right to make decisions about the child's care, custody and control without state supervision, even if the child will not be returned to the parent's physical custody"). That, of course, did not relieve DHS of its obligation to continue providing reunification services to father. *See S. M. H.*, 283 Or App at 305 ("DHS must make reunification efforts directed at *each* parent[.]" (Emphasis added.)). It does, however, help place the services that it did provide to him in perspective.

Further, although father sought in this appeal to challenge the legal sufficiency of DHS's efforts in regard to mother, he does not dispute that they were extensive. In addition to providing mother with the types of services it provided father before his incarceration, DHS provided

mother with in-person visitation with A three times a week, hands-on parenting training with multiple professionals, domestic-violence counseling, a neuropsychological examination, and specialized treatment directed at her co-occurring mental-health and substance-abuse disorders.

It is in that context that we evaluate father's contention that DHS's services to him were inadequate under our case law. Citing cases such as *S. M. H.* and *Williams*, father characterizes those services as "virtually nonexistent." Admittedly, there are some similarities between those cases and his. As in *S. M. H.*, for example, father contends here that DHS denied him all services for an extended time. *See S. M. H.*, 283 Or App at 306-09 (although DHS provided services to mother in the two or three months immediately preceding the permanency hearing, it provided no services for approximately six months after mother was incarcerated). Further, father contends that, like the mother in *S. M. H.*, he "was demonstrably willing to engage in services following [his] arrest," *id.* at 309, including participating in Dialectical Behavioral Therapy (DBT) and creating a relapse plan and initiating a 12-step program, efforts that the juvenile court implicitly acknowledged in commending father for his progress.

Notably, however, in *S. M. H.*, "DHS provided no assistance in arranging and paying for phone and video visits until just prior to the permanency hearing" and "made no efforts whatsoever to arrange in-person visits with the children[.]" *Id.* at 306-07. Here, on the other hand, the evidence of DHS's efforts in that regard, though certainly not exhaustive, showed that DHS had arranged for phone visitation (albeit through mother), had paid money towards father's prison account to facilitate video calls, and had made efforts towards having father transferred to a prison closer to A to make in-person visitation possible. Further, unlike the mother in *S. M. H.*, father was not viewed as a potential custodial parent, at least not in the reasonable future. *See id.* at 309-10 (noting that the mother anticipated her potential release from prison "roughly seven months after the permanency hearing"). Thus, unlike in that case, here there was little if anything here to suggest that father "would * * *

have benefited from additional services." *Id.* at 309; *see also S. W.*, 267 Or App at 291 (though DHS could have maintained better contact with the father, "father [did] not explain how, even if DHS had had more contact with prison officials or called father more frequently, that would have furthered the statutory objective of allowing [the child] 'to safely return home.' ORS 419B.476(2)(a)"); *M. K.*, 257 Or App at 416 (reasonable-efforts determination considers what benefits might flow from further services).

*Williams* is likewise distinguishable. In that case, like this one, the mother had received extensive services from DHS, significantly more than the father. *Williams*, 204 Or App at 507. There, however, we described DHS's involvement with the father as "virtually nonexistent," *id.*, a description father attributes to DHS's efforts in his case. Specifically, in *Williams*, DHS had only contacted the father twice outside of the courtroom, the first time to have him sign a service agreement—which, it turns out, did not offer or suggest any services—and a second time by writing him "a letter suggesting that he should continue with any services provided in the jail" where he was being held. *Id.* This case is not like *Williams*. As noted above, 303 Or App at 409 n 9, father received considerable services from DHS before he committed and was incarcerated for serious crimes. And, although the efforts DHS made on father's behalf after his incarceration were certainly limited, under the circumstances, we cannot characterize them as "virtually nonexistent," as father himself characterizes them.

In our view, father's case is more similar to *S. W.* than it is to the cases that father relies on. To be sure, in that case, the father had been resistant to services in a way that is not reflected in the record here, or at least not in any way that DHS has brought to our attention. *S. W.*, 267 Or App at 291-92. As more directly relevant here, however, DHS argued in *S. W.* that

"its failure to contact the prison counselors or to arrange for visitation is not significant in light of the circumstances and the other efforts that DHS did make, and that, under the totality of the circumstances, the agency made reasonable efforts to give father a reasonable opportunity to

demonstrate that reunification with [the child] was possible in a realistic period of time."

*Id.* at 289 (internal quotation marks omitted). In ultimately accepting that argument, we acknowledged that DHS certainly "could have done more," notwithstanding the father's incarceration. *Id.* However, comparing the services that DHS had provided the father over the life of that case with those provided to the father in *Williams*, we characterized DHS's involvement as "something more than 'virtually nonexistent,' * * * *but less than ideal.*" *Id.* (emphasis added).

Given DHS's lengthy delay before resuming services following father's incarceration, together with the limited services that it provided even then, DHS's efforts in this case can be characterized much the same way. That is, although they were more than "virtually nonexistent," they were probably "less than ideal." The question is not, however, whether DHS provided ideal services; the question is whether the services that DHS did provide were reasonable. We conclude that they were.

In reaching that conclusion, we reject father's suggestion that, because DHS's reunification efforts on his behalf were limited and late, they were unreasonable as a matter of law. We do so for several reasons. First, we note that, like the father in *S. W.*, here father "completely discounts the efforts that DHS made in the initial phase of this case to promote the development of a relationship between [the] father and [the child]." *Id.* at 292. Those efforts were extensive, and yet, at the first permanency hearing in December 2018, there was no indication that father had made any progress towards ameliorating the bases of the juvenile court's jurisdiction during the time that they were provided. We further observe that father has not identified what, if any, additional benefits would have flowed from DHS making additional efforts of any particular kind. *See id.* at 291-93 (rejecting argument that further efforts were required when father had not explained how those efforts would advance the statutory goal of reunification); *cf. Dept. of Human Services v. M. C. C.*, 303 Or App 372, 381-82, 463 P3d 592 (2020) (concluding that DHS's efforts had not been reasonable when they failed to afford incarcerated father

"a reasonable opportunity to enlist the help of his sister to care for [his child], which he had sought to do since early in the case"). Finally, although the juvenile court did not articulate its reasoning when it ruled that DHS's reunification efforts on behalf of father were reasonable, father has not argued that the court's "cost-benefit analysis" was somehow deficient. *See C. L. H.*, 283 Or App at 323 (requiring juvenile court addressing a parent's reasonable-efforts argument to "engage in something resembling a cost-benefit analysis" (internal quotation marks omitted)). In light of all of those circumstances, we conclude that the juvenile court did not err in determining that DHS's reunification efforts on behalf of father were reasonable, and we affirm.

Affirmed.